FILED

APR 2 2 2022

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Peter Strojnik (Sr.),
7847 N. Central Ave.
Phoenix, Arizona 85020
602-524-6602
ps@strojnik.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case No: 3:19-cv-02210-BAS-MSB

**REQUEST FOR RULING RE ECF # 63 RE:**

**(1) MOTION TO STRIKE ALL POST DISMISSAL ORDERS AND JUDGMENTS FOR LACK OF SUBJECT MATTER JURISDICTION (IN ADDITION TO CONTEMPT RULINGS VACATED BY ORDER DATED DECEMBER 21, 2021. ECF No. 62); AND**

**(2) REQUEST TO STRIKE SUPERFLUSOUS, DISPARAGING AND DEFAMATORY STATEMENTS FROM ORDER ECF 62 OR TO PROVIDE SOME BASIS FROM THE RECORD.**

PETER STROJNIK,

Plaintiff,

vs.

VILLAGE 1017 CORONADO, INC. DBA HOTEL MARISOL CORONADO

Defendant.

## 1. Introduction

It is undeniable that public accommodations pose an existential and immediate threat to the equality and equity in the public space. It is incontrovertible that public accommodations have engaged in, and continue to engage in, a widespread systemic segregation of the disabled. By doing so, public accommodations cause unnecessary crowding of the dockets in the federal and state courts.

1

It is utterly incomprehensible how the offending public accommodations have been able to turn the tables to blame the disabled individuals for their own inequity. So now, a disabled plaintiffs invariable encounter a cottage industry of defense lawyers some of whom, as Mr. Stillman, engage in extortion and perjury.

One of the means employed by the billing and collecting crowd is through threats and extortion. For example, it is Mr. Stillman's avowed effort to deprive a disabled person of his constitutional rights one way or another *unless* a disabled plaintiff dismisses his cases with prejudice[1] (**Exhibit 1**):

> Remember this email. I intend to get your complaint dismissed, require you to post a bond in the unlikely event that it is not dismissed with prejudice, and my client *will* seek all of its attorney's fees from you. ...[M]y client will also seek to have you declared a vexatious litigant, which will require you to obtain prior permission from the presiding judge *before* you file a complaint. **At this time, my client will accept an immediate dismissal with prejudice and you may go about your business against other defendants...** (Emphasis supplied)

So, if a disabled person does not dismiss his disability claim, Mr. Stillman will revoke his 1st Amendment right to redress and make the disabled person's life unbearable. As if it already weren't. Such level of coercion by attorneys has been recognized as extortion by the California Court of Appeals. (**Exhibit 2**.) Such conduct encourages some defense lawyers like Mr. Stillman to lie, disparage, create evidence and file false declarations with utter and expected impunity. (**Exhibits 3, 4**.)

## 2. There has Been No Objection to Plaintiff's Motion by Mr. Stillman

Mr. Stillman, knowing full well that his jig is up, did not aid this Court to provide *some* evidentiary basis for his relentless lies and misrepresentations that caused this Court to make its repugnant comments. Mr. Stillman knows full well that Plaintiff provided every piece of his financial condition required by the Court that showed, without any controverting evidence, that he is currently unable to pay the null and void attorney's fees judgment. It was Mr. Stillman's unremitting misrepresentations that ultimately caused this

---

[1] Mr. Stillman issued this extortionate threat against another pro se Plaintiff in a different case but has been applying it to all cases, in including this one.

Court to disparage Plaintiff. One would expect Mr. Stillman to rush and provide such information but, because there is no such information, Mr. Stillman remained silent.

Silence is admission.

### 3. Conclusion and Prayer for Relief.

Plaintiff again requests that the Court to strike all jurisdictionally invalid rulings. Plaintiff understands that a court, including this Court, relies on the representations of counsel in reaching its decisions. Here, the Court relied on Mr. Stillman. The reliance was not warranted. This matter has to be resolved for the sake of District Court's own honor. There have to be harsh consequences for Mr. Stillman's lack of candor.

RESPECTFULLY SUBMITTED (MAILED) this 20th day of April 2022.

PETER STROJNIK

/s//Peter Strojnik
Plaintiff

Mailed to the District Court this 20th day of April, 2022.

Stillman served by email.

/s/

# EXHIBIT 1

 **Gmail**

Fernando Gastelum <fernandog8899@gmail.com>

---

### Notice of Motion and Motion for Rule 11 Sanctions
1 message

---

**Philip H. Stillman** <pstillman@stillmanassociates.com>                          Wed, Sep 8, 2021 at 9:40 AM
To: Fernando Gastelum <fernandog8899@gmail.com>

As you know, I represent defendant TC HERITAGE INN 2 OF BAKERSFIELD LLC.  Attached hereto is a
Notice of Motion and Motion for Rule 11 Sanctions.  Pursuant to Fed.R.Civ.P. 11, you are entitled to 21 days'
notice before a party can file a Motion for Sanctions, which you are being given today.  If you do not
withdraw your frivolous and false complaint, my client will file the attached motion, and seek all of its
attorney's fees incurred in defending this frivolous action.

Remember this email.  I intend to get your complaint dismissed, require you to post a bond in the unlikely
event that it is not dismissed with prejudice, and my client *will* seek all of its attorney's fees from you.  I think
that your litigation history from the Arizona federal courts speaks for itself, but my client will also seek to
have you declared a vexatious litigant, which will require you to obtain prior permission from the presiding
judge *before* you file a complaint.  At this time, my client will accept an immediate dismissal with prejudice,
and you may go about your business against other defendants.  If not, I will be filing a motion to dismiss
based on *Gastelum v. Canyon Hospitality, LLC*, which others whom you have sued will be able to access
and use to get your complaints dismissed against them with little cost to them, which will further impede
your new business venture in California.

I strongly encourage you to take this matter seriously.

Philip H. Stillman | STILLMAN ▪ ASSOCIATES
3015 North Bay Road | Suite B |
Miami Beach, FL 33140 |
V: 888.235.4279 | F: 888.235.4279
pstillman@stillmanassociates.com
www.stillmanassociates.com

*Licensed to Practice in California and Massachusetts*

---

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, *et
seq.*, and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above
and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not
the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in
error, please immediately notify us by telephone at (888) 235-4279 and return the original message to us at pstillman@stillmanassociates.com.

EXHIBIT 2

casetext   CARA A.I.   extortion   JX   Q   §   PS   ?   ✓

Results  ‹  ›          Flatley v. Mauro   Copy Cite          Q

📄  🖨  📁  ✉  •••Read   Analyses 8   Briefs 40   Citing Cases 1k

# Flatley v. Mauro

Supreme Court of California   Jul 27, 2006

39 Cal.4th 299 (Cal. 2006)

39 Cal.4th 299   ·   46 Cal. Rptr. 3d 606   ·   139 P.3d 2

No. S128429.

July 27, 2006.

Appeal from the Superior Court of Los Angeles County, No. BC291551, Richard C.
300 Hubbell, Judge. *300

Sedgwick, Detert, Moran Arnold, James J. S. Holmes, Christina J. Imre, Douglas J.
Collodel, Orly Degani and Wendy L. Wilcox for Defendant and Appellant.

Greenberg Glusker Fields Claman Machtinger Kinsella, Bertram Fields and Ricardo P.
Cestero for Plaintiff and Respondent.

Levy, Ram Olson, Karl Olson, Erica L. Craven; Thomas W Newton; Karlene W. Goller;
Harold W. Fuson, Jr.; Stephen J. Burns; Levine Sullivan Koch Schulz and James E.
Grossberg for California Newspaper Publishers Association, Los Angeles Times, The
Copley Press, Inc., McClatchy Newspapers, Inc., and the Orange County Register as Amici
Curiae.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Theodora
Berger, Assistant Attorney General, Richard M. Frank, Edward G. Weil and Susan S.
305 Fiering, Deputy Attorneys General, as Amici Curiae. *305

304 *304

## OPINION

MORENO, J.

Plaintiff Michael Flatley, a well-known entertainer, sued defendant D. Dean Mauro, an
attorney, for civil extortion, intentional infliction of emotional distress and wrongful
interference with economic advantage. Flatley's action was based on a demand letter Mauro
sent to Flatley on behalf of Tyna Marie Robertson, a woman who claimed that Flatley had
raped her, and on subsequent telephone calls Mauro made to Flatley's attorneys, demanding
a seven-figure payment to settle Robertson's claims. Mauro filed a motion to strike Flatley's
complaint under the anti-SLAPP statute.[1] (Code Civ. Proc., § 425.16.) He argued that the
letter was a prelitigation settlement offer and therefore Flatley's complaint arose from
Mauro's exercise of his constitutionally protected right of petition. The trial court denied the

casetext        CARA A.I.        extortion                    JX    🔍        §    PS  ❓ ✅

Results  ‹  ›                    Flatley v. Mauro   Copy Cite

📄 🖨 📁 ✉ •••Read   Analyses 8   Briefs 40   Citing Cases 1K



*Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [ 3 Cal.Rptr.3d 636, 74 P.3d 737].) All further unspecified statutory references are to the Code of Civil Procedure.

We conclude that, consistent with the legislative intent underlying the anti-SLAPP statute as revealed by the statutory language, and consistent with our existing anti-SLAPP jurisprudence, a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition, cannot use the anti-SLAPP statute to strike the plaintiff's complaint. Applying this principle in the specific circumstances of the case before us, we agree with the Court of Appeal's conclusion. Mauro's communications constituted criminal extortion as a matter of law and, as such, were unprotected by constitutional guarantees of free speech or petition. Therefore, the anti-SLAPP statute does not apply. Accordingly, we affirm the decision of the Court of Appeal.

## I. FACTS AND PROCEDURAL HISTORY

Michael Flatley is a performer and dance impresario who owns "the stock of corporations that present live performances by Irish dance troupes throughout the world." On March 4, 2003, Tyna Marie Robertson sued Flatley in Illinois for battery and intentional infliction of emotional distress based on allegations that Flatley had raped her in his hotel suite in Las Vegas on the night of October 19-20, 2002. Robertson was represented by D. Dean Mauro, 306    *306 an Illinois attorney. Robertson and Mauro then appeared on television, where Robertson described the alleged rape "in extremely lurid detail."[2]

> 2   Flatley requests that we take judicial notice that Robertson voluntarily dismissed this action and that a subsequent action Robertson brought against Flatley was also dismissed. (Evid. Code, §§ 452, subd. (c), 459.) While it is true, as Mauro maintains, that these dismissals were not before the trial court when it ruled on his motion to strike, nonetheless the documents are proper subjects for judicial notice and help complete the context of this case. Therefore, we grant Flatley's request. Both the Attorney General and Flatley have asked us to take judicial notice of portions of the legislative history of Code of Civil Procedure section 425.16. Flatley's request is in support of his claim that the statute only protects the valid exercise of constitutionally protected speech and petition rights. The Attorney General's request is in connection with his response to an argument made by Mauro that all litigation-related communication is protected under the statute, even if illegal. (See *post*, at pp. 320-325.) Mauro objects on the grounds that the statute speaks for itself and recourse to legislative history is unnecessary. While we have in the past made the same observation regarding the plain language of the statute, and we reach our conclusions in this case based on the statute's plain language, we have nonetheless granted similar requests to take judicial notice of section 425.16's legislative history in past cases. (See, e.g., *Briggs v. Eden Council for Hope Opportunity* (1999) 19 Cal.4th 1106, 1120 [ 81 Cal.Rptr.2d 471, 969 P.2d 564].) Accordingly, we grant the requests.

On March 6, 2003, Flatley filed his complaint in the present action in California against Mauro, Robertson and Doe defendants.[3] In a second amended complaint, Flatley alleged five causes of action for civil extortion , defamation, fraud, intentional infliction of emotional distress, and wrongful interference with prospective economic advantage. The

≡ casetext      CARA A.I.      extortion                              JX   🔍        §      PS  ❓ ✓

Results  ‹  ›                    Flatley v. Mauro   Copy Cite                              ⌕

🖼 🖨 📁 ✉ ••• Read    Analyses 8    Briefs 40    Citing Cases 1k

Mauro answered with a general denial and asserted various affirmative defenses including that Flatley's claims were barred by section 425.16, the anti-SLAPP statute. On August 1, 2003, Mauro filed a motion to strike Flatley's complaint under that statute.

Flatley's opposition to the motion argued that Mauro's communications constituted criminal extortion and were therefore not protected by the anti-SLAPP statute. He argued further that he could demonstrate a probability of prevailing on the merits. In support of his opposition, Flatley filed several declarations, including his own and those of his personal secretary, Thomas Trautmann, and his attorneys, John Brandon, Bertram Fields, and Richard Cestero.[4]

307  *307

> [4] The only declaration Mauro submitted in support of his motion to strike Flatley's complaint was his own. His declaration acknowledged that he had mailed the January 2, 2003 letter and attachments to Flatley described above. The balance of his declaration recounted having received letters from Fields seeking an extension of time to respond to that letter and his reply. Finally, Mauro stated that "since a settlement could not be reached" he filed Robertson's suit. In his reply to Flatley's opposition to the motion to strike, Mauro objected to portions of the declarations submitted by Flatley. The trial court did not rule on those objections nor does the record reveal that Mauro pressed for a ruling. His objections are therefore deemed forfeited and we consider Flatley's declarations in their entirety. ( *Gallant v. City of Carson* (2005) 128 Cal.App.4th 705, 710 [ 27 Cal.Rptr.3d 318]; *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1014, fn. 4 [ 5 Cal.Rptr.3d 668].)

The declarations submitted by Flatley set forth the following scenario:

Flatley met Robertson in Las Vegas sometime before October 2002. Robertson was very friendly and Flatley gave her the telephone number of his personal secretary, Thomas Trautmann (Trautmann) in the event she wanted to reach Flatley.

In October 2002, Robertson called Trautmann to arrange a rendezvous with Flatley. On October 19, 2002, Robertson arrived at Flatley's two-bedroom suite in the Venetian Hotel in Las Vegas. She was told that one room was for Flatley and the other was for Trautmann. Robertson put her belongings in Flatley's bedroom. She did not request alternate accommodations or protest the accommodations offered.

That evening, Flatley and Robertson had dinner together. Upon returning to Flatley's hotel room, Robertson excused herself to the bathroom. Flatley disrobed and got into bed. Robertson reappeared, nude, and entered Flatley's bed, where she remained for the night. According to Flatley, everything that transpired between him and Robertson that night was consensual. At no time did Trautmann, who was in the next room with the door open, hear any cry or complaint of any kind.

The next morning, Robertson entered the common area of the suite, and kissed Flatley in Trautmann's presence. Her demeanor was relaxed and happy. She ate breakfast with Flatley, speaking affectionately to him and cordially to Trautmann. Upon leaving, she kissed Flatley again and said she hoped to see him again.

10/14/21, 5:08 PM                                    Flatley v. Mauro, 39 Cal.4th 299 | Casetext

settlement purposes only." The subject line stated in all-capital, boldface, underlined type: "
**LAWSUIT AGAINST MICHAEL FLATLEY, INDIVIDUALLY, AND UNICORN**
308    **ENTERTAINMENT, INC., AND THE** *308 **VENETION** *[sic]* **RESORT-HOTEL-**
**CASINO VENTURE GROUP[,]** " Mauro identified his client as "Jane Doe" and referred
to a report on file with the Las Vegas Police Department. The next line stated "Date of
Rape/Sex Assault: **October 19-20, 2002."**

> 5    The letter is reproduced in its entirety as appendix A.

The letter was addressed: "DEAR FLATLEY, *et. al.: [sic]* [¶] Please be advised that we
represent a women [ *sic*] with whom you engaged in forcible sexual assault on or about
October 19-20, 2003 [ *sic*: 2002]. Please consider this our ***first*** , and ***only*** , attempt to
amicably resolve this claim against all Defendants named in the Complaint at Law enclosed
herein."

On the second page, a large caption announced " **NOTICE OF CLAIM ATTORNEY'S**
**LIEN** ". The letter continued: "Please consider this as Notice of our Attorneys' [ *sic*] Liens.
We hereby make a claim and lien in the amount of 40% of the Total Recovery of all funds
obtained through trial or settlement, plus all costs of suit, and attorney fees leveled against
you." After urging Flatley to contact his insurance carrier, the letter states "Tell them to
contact me directly." It warns that Flatley's failure to do so will result in the filing of a
lawsuit and that "all judgment proceeds" would be sought ***"directly from your personal***
***assets."*** The letter then states: " **You are granted until January 30, 2002** *,[sic:* **2003] to**
**resolve this matter** . The amounts claimed in the lawsuit are ***naturally negotiable prior to***
***suit.*** " The letter warns, however, that if Flatley fails to meet the January 30 deadline "all
offers to compromise, settle and amicably resolve this case will be **automatically**
**withdrawn."** The letter then goes on to "advise" Flatley that Mauro has retained "several
forensic expert witnesses" whose opinions "shall be disclosed in detail in the public filed
court documents in this litigation." Mauro also advises Flatley that he has "worked at
Lloyd's of London, and [is] familiar with International Law. These causes of action allow
for PUNITIVE DAMAGES. Punitive Damages are non-dischargeable in bankruptcy, and
are recognized under British Law. We can therefore execute and collect any award against
**MICHAEL FLATLEY** *personally* in the U.S., or the U.K." Next, Mauro refers to his
expert " **Economist Frank Maguire** " who will testify "as to the amount of punitive
damages which the law recognizes to justify `sending a message' or what constitutes a
`deterrent.'"

The first paragraph of the third page of Maura's letter refers Flatley to a "settlement of
**$100,000,000.00**" awarded as punitive damages in an unidentified case. The second full
paragraph then states that an investigation into Flatley's assets for purposes of determining
an appropriate award of punitive damages, will require "an in-depth investigation" and that
any information would then " **BECOME A MATTER OF PUBLIC RECORD, AS IT**
**MUST BE FILED WITH THE COURT,** as it will be part of the bases of several of our
309    expert's [ *sic*] testimony." The third paragraph states in its entirety: " Any *309 **and all**
**information, including Immigration, Social Security Issuances and Use, and IRS and**
**various State Tax Levies and information will be exposed.** We are positive the media
worldwide will enjoy what they find." After a paragraph describing the potential testimony

casetext   CARA A.I.   extortion   JX   ⌕   §   PS   ?   ✓

Results   ‹   ›              Flatley v. Mauro   Copy Cite

Read   Analyses 6   Briefs 40   Citing Cases 1k

immediately **[be] turned over to any and all appropriate authorities.**" The final
paragraph warns that once the lawsuit is filed additional causes of action "shall arise"
including "Defamatory comments, Civil Conspiracy, Reckless Supervision" which are "just
the beginning" and that "ample evidence" exists "to prove each and every element for all
these additional causes of action. Again, these actions allow for **Punitive Damages.**"

At the top of the final page of the letter is the caption: " **FIRST FINAL TIME-LIMIT
SETTLEMENT DEMAND.** " Beneath it a paragraph warns that there shall be " **no
continuances nor any delays.** If we do not hear from you, then we shall know you are not
interested in amicably resolving this claim and we shall immediately file suit." At the
bottom of the page, beneath Mauro's signature, a final paragraph warns Flatley that, along
with the filing of suit, press releases will be disseminated to various media sources,
including but not limited to " **Fox News Chicago, Fox News Indiana, Fox News
Wisconsin, and the U.S. National Fox News Network; WGN National U.S. Television;
All Local Las Vegas Television, radio stations and newspapers; The Chicago Tribune,
The Chicago Southern Economist, The News Sun, The Beacon News, The Daily
Herald, The New York Times, The Washington Post; ALL National U.S. Television
Networks of NBC, ABC and CBS; as well as INTERNET POSTINGS WORLDWIDE,
including the BRITISH BROADCASTING COMPANY, and the Germany National
News Network Stations.**"

Attached to the letter were 51 pages of material, including a draft of Robertson's complaint
against Flatley, Robertson's medical records pertaining to treatment for the alleged rape,
certificates of achievement awarded to Mauro, newspaper articles chronicling Mauro's
multimillion-dollar cases and settlements, and the curricula vitae of Mauro's experts.

Among the attachments was a letter Robertson wrote to the Las Vegas Police Department
on November 17, 2002. The letter refers to a telephone call she had made to the police
department on November 14 in which she reported the rape. She asked that the letter, which
310  described the rape, be *310 added to the earlier report because she "did not get an adequate
opportunity to explain." She added, however, that she had no "interest in seeing the Initial
Incident Complaint form," because she was "a private person, and this is not something
about which I can openly or freely explain to people." She also wrote that she could not at
that time go into "more specific, or graphic details" because she was not "in any condition
to relive this."

The record does not show that Robertson provided any additional information to the police,
or that the police took any action regarding her allegation. According to Flatley's and
Trautmann's declarations, no one in the Las Vegas Police Department contacted either
Flatley or his representatives about the allegation and Flatley remained unaware of the
allegation until Brandon received Mauro's letter.

Upon receipt of Mauro's letter, Brandon immediately called Mauro. Mauro gave Brandon a
deadline of January 30, 2003, "to offer sufficient payment." On January 9, 2003, Mauro
telephoned Brandon to complain that he had not heard from Flatley or Flatley's
representatives. Brandon explained that he was not handling the matter but offered to pass
along any message. Mauro told him that he would not extend the January 30, 2003

message with Brandon's secretary. The message read: "Dean Mauro needs a call back in one-half hour, otherwise they are going public." When Brandon returned Mauro's call, Mauro "complained that people were investigating the matter before contacting him and were doing so in an intimidating manner. He said that if he did not receive a call by 8 p.m. Central Standard Time . . ., he would 'go public and the January 30 deadline is gone.'" He said, "I already have the news media lined up" and would "hit him [Flatley] at every single place he tours." Brandon read this back to Mauro to confirm its accuracy. When Brandon asked Mauro why he was concerned about Flatley's attorneys investigating Robertson's claim before making an offer, Mauro stated that this "case is like an insurance claim where the adjuster would call the lawyer to acknowledge the attorney's lien." Brandon asked Mauro if acknowledging the lien was a problem. Mauro said "never mind about that, just pass on the message." Brandon conveyed the message to Bertram Fields, the attorney

311   handling the matter for Flatley. *311

Fields called Mauro later that day. Mauro told Fields he knew how to "play hardball" and that if Flatley did not pay an acceptable amount, he and Robertson would "go public." Mauro said he would ensure that the story would follow Flatley wherever he or his troupes performed and would "ruin" him. Fields asked Mauro how much he was demanding and Mauro replied "it would take seven figures."

Fields reported Mauro's conduct to the FBI and arranged for Flatley to give the FBI a voluntary interview without the presence of counsel. Hoping to allow the FBI more time to investigate, Fields wrote Mauro asking him to extend the deadline. Mauro extended the deadline by one day in a letter that complained that Fields had failed to return Mauro's numerous messages. "You have my personal cell phone number, on 24 hours daily, and we still have received no substantive conversation of any kind for nearly a month."

Flatley did not pay Robertson and Mauro.

Mauro's reply to Flatley's opposition to the motion to strike argued that his January 2, 2002 letter was a prelitigation settlement offer in furtherance of his constitutional right of petition and, therefore, protected by section 425.16, subdivision (e)(1) and (4). He argued further that Flatley had failed to demonstrate a probability of prevailing on any of his causes of action.

On September 22, 2003, the trial court denied Mauro's motion to strike. It found that Mauro had not satisfied his initial burden to show that his communication was protected by section 425.16. Mauro appealed (§ 904.1, subd. (a)(13)), and the Court of Appeal affirmed, holding that, as a matter of law, Mauro's communications constituted criminal extortion and therefore were not protected under section 425.16. The Court of Appeal did not address whether Flatley had demonstrated a probability of prevailing on the merits. We granted Mauro's petition for review.[6]

[6]   Mauro is no longer licensed to practice law in Illinois, having voluntarily retired in 2005, according to the Illinois State Bar Web site. He has no public record of discipline. (http://www.iardc.org [as of July 27, 2006].)

## II. DISCUSSION

casetext    CARA A.I.    extortion    JX    🔍    §    PS ❓ ✓

Results ‹ ›    Flatley v. Mauro   Copy Cite

Read    Analyses 8    Briefs 40    Citing Cases 1x

312 arises from the defendant's exercise of his or her *312 constitutionally protected rights of free speech or petition for redress of grievances. (§ 425.16, subd. (b)(1).) We described the purpose of the statute, and the process by which a motion to strike is determined, in the companion case, *Soukup v. Hafif (2006)* 39 Cal.4th 260 [ 46 Cal.Rptr.3d 638, 139 P.3d 30], where we said: "'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought "'to prevent SLAPPs by ending them early and without great cost to the SLAPP target.'" [Citation.] Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' ( *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [ 25 Cal.Rptr.3d 298, 106 P.3d 958]; see *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 737 [section 425.16 `is a procedural device for screening out meritless claims'].) [¶] . . . [¶] The Legislature's purpose in enacting the anti-SLAPP statute is set forth in its findings and declarations. 'The Legislature finds and declares that it is in the public interest to encourage participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.' (§ 425.16, subd. (a).) Furthermore, to accomplish this purpose the Legislature has directed that the statute `be construed broadly.' ( *Ibid.* ) To this end, when construing the anti-SLAPP statute, `[w]here possible "we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law. . . ." [Citation.]' ( *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 733, quoting *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [ 59 Cal.Rptr.2d 671, 927 P.2d 1175].)" ( *Id.* at pp. 278-279.)

Our concern for effectuating the legislative intent as demonstrated by the plain language of the statute has led us to reject attempts to read into section 425.16 requirements not explicitly contained in that language. (See, e.g., *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th 728, 735 [no categorical exemption for malicious prosecution actions under section 425.16 where the Legislature had not created such an exemption]; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 74-76 [ 124 Cal.Rptr.2d 519, 52 P.3d 695] [declining to read into section 426.16 a requirement that a defendant demonstrate that the plaintiff's action actually intended to chill the defendant's exercise of his or her protected rights]; *Briggs v. Eden Council, supra,* 19 Cal.4th at pp. 1113-1117 [section 425.16, subdivision (e) (1) and (2) does not require that statements made before, or in connection with an issue pending before an official proceeding, also involve an issue of public significance absent 313 statutory language to that effect].) In short, our anti-SLAPP jurisprudence has *313 attempted to effectuate the central purpose of the statute by carefully examining the actual words of the statute and giving them their plain meaning.

As noted, the purpose of section 425.16 is to prevent the chilling of "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" by the "abuse of the judicial process." (§ 425.16, subd. (a).) As a necessary corollary to this statement, because not all speech or petition activity is constitutionally protected, not all speech or petition activity is protected by section 425.16. (See, e.g., *Lam v. Ngo* (2001) 91

10/14/21, 5:08 PM
Flatley v. Mauro, 39 Cal.4th 299 | Casetext

(2002) 95 Cal.App.4th 853, 864 [ 117 Cal.Rptr.2d 82].) The case most often cited in support
of this proposition is *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 [ 102
Cal.Rptr.2d 864] *(Paul)*, disapproved on other grounds in *Equilon Enterprises v. Consumer
Cause, Inc.* (2002) 29 Cal.4th 53, 68, footnote 5 [ 124 Cal.Rptr.2d 507, 52 P.3d 685].
Flatley argues, and the Court of Appeal agreed, that *Paul* is dispositive of the issues raised
in this case, so we examine it in some detail.

2. Paul

In *Paul*, the plaintiff was a city council member seeking reelection. Following his defeat, he
filed an action against several individuals, alleging that they "interfered with plaintiffs
candidacy by influencing the election with illegal campaign contributions for one of his
opponents. Plaintiff alleged that defendants' acts violated the Political Reform Act of 1974.
(Gov. Code, § 81000 et seq. (the Political Reform Act).)" ( *Paul, supra,* 85 Cal.App.4th at
p. 1361, italics omitted.) The defendants "moved to strike the complaint" as a SLAPP but "
[t]heir moving papers . . . show[ed] that they in fact did violate the Political Reform Act
when they laundered campaign contributions to persons running for local or state offices." (
*Ibid.*) Nonetheless, the "defendants argued that their money laundering was 'in furtherance
of [their] constitutional rights of free speech' and '[arose] out of acts in furtherance of
[their] constitutionally protected conduct.'" ( *Id.* at pp. 1361-1362.) The plaintiff argued in
his opposition that "section 425.16 [did] not apply in this case because defendants' actions
in laundering campaign money do not constitute constitutionally protected activity." ( *Id.* at
314    p. 1362.) *314

The Court of Appeal agreed with the plaintiff. After quoting the language of section 425.16,
subdivision (a) on the purpose of the statute, the court discussed the respective burdens the
statute places on the parties upon the filing of a motion to strike. "First, the court decides
whether the defendant has made a threshold prima facie showing that the defendant's acts,
of which the plaintiff complains, were ones taken in furtherance of the defendant's
constitutional rights of petition or free speech in connection with a public issue. [Citation.]
If the court finds that such a showing has been made, then the plaintiff will be required to
demonstrate that 'there is a probability that the plaintiff will prevail on the claim.'
[Citations.] The defendant has the burden on the first issue, the threshold issue; the plaintiff
has the burden on the second issue." ( *Paul, supra,* 85 Cal.App.4th at p. 1364, fn. omitted.)

The court held that to meet its burden "the defendant does not have to *'establish* its actions
are constitutionally protected under the First Amendment as a matter of law. If this were so
the second clause of subdivision (b) of section 425.16 would be superfluous because by
definition the plaintiff could not prevail on its claim.' [Citation.] Rather, the defendant must
present a prima facie showing that the plaintiff's causes of action arise from acts of the
defendant taken to further the defendant's rights of free speech or petition in connection
with a public issue. [Citation.] Only if the defendant makes this prima facie showing does
the trial court consider the second step of the section 425.16, subdivision (b)(1) analysis; at
that point the burden shifts to the plaintiff to make a prima facie showing of facts which, if
proven at trial, would support a judgment in the plaintiff's favor." ( *Paul, supra,* 85
Cal.App.4th at p. 1365.)

their constitutional right of free speech. This conclusion is established by the factual record before us and is not really disputed by the defendants. Indeed, defendants argue that they are entitled to the benefit of section 425.16 in spite of such illegality." ( *Paul, supra*, 85 Cal.App.4th at p. 1365.)

*Paul* acknowledged that the "making of a political campaign contribution is a type of political speech." ( *Paul, supra*, 85 Cal.App.4th at p. 1365.) Nonetheless it rejected the defendants' claim that, because their money laundering activity was taken "in furtherance of their constitutional right of free speech," the activity fell within the ambit of the anti-SLAPP statute even though illegal. ( *Ibid.*) "[T]he probability that the Legislature intended to give *315 defendants section 425.16 protection from a lawsuit based on injuries they are alleged to have caused by their *illegal* campaign money laundering scheme is as unlikely as the probability that such protection would exist for them if they injured plaintiff while robbing a bank to obtain money for the campaign contributions or while hijacking a car to drive the campaign contributions to the post office for mailing. . . . Thus, while it is technically true that laundering campaign contributions is an act in furtherance of the giving of such contributions, that is, is in furtherance of an act of free speech, we reject the notion that section 425.16 exists to protect such illegal activity." ( *Id.* at p. 1366.)

In support of its conclusion, *Paul* cited *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809 [ 33 Cal.Rptr.2d 446], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at page 68, footnote 5, which distinguished between activity that would be protected under the statute and activity that would not. "Thus, if the defendant's act was a lawsuit against a developer the defendant would have a prima facie First Amendment defense. [Citation.] But, if the defendant's act was burning down the developer's office as a political protest the defendant's motion to strike could be summarily denied without putting the developer to the burden of establishing the probability of success on the merits in a tort suit against defendant." ( *Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 820.) The *Paul* court commented: "While laundering campaign money may not be as dramatic or physically dangerous as burning down a building, it is equally outside the scope of section 425.16's protection." ( *Paul, supra,* 85 Cal.App.4th at p. 1367.)

*Paul* emphasized the narrow circumstance in which a defendant's assertedly protected activity could be found to be illegal as a matter of law and therefore not within the purview of section 425.16. "This case . . . involves a factual context in which defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection. Thus, there was no dispute on that point and we have concluded, as a matter of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by section 425.16. However, had there been a factual dispute as to the legality of defendants' actions, then we could not so easily have disposed of defendants' motion." ( *Paul, supra,* 85 Cal.App.4th at p. 1367.) The court explained that, if the plaintiff contested the validity of the defendant's exercise of protected rights "and unlike the case here, cannot demonstrate as a matter of law that the defendant's acts do not fall under section 425.16's protection, then the claimed illegitimacy of the defendant's acts

casetext    CARA A.I.    extortion                        JX    Q         §    PS  ?  ✓

Results   ‹   ›                  Flatley v. Mauro   Copy Cite

Read   Analyses 8   Briefs 40   Citing Cases 1k

any activity that can conceivably be characterized as being "in furtherance" of a defendant's protected speech or petition rights if, as a matter of law, that activity was illegal and by reason of the illegality not constitutionally protected. ( *Paul, supra,* 85 Cal.App.4th at p. 1367.) In such a narrow circumstance, where either the defendant concedes the illegality of its conduct or the illegality is conclusively shown by the evidence, the motion must be denied. The rationale is that the defendant cannot make a threshold showing that the illegal conduct falls within the purview of the statute and promotes section 425.16's purpose to "prevent and deter `lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).)" ( *Varian Medical Systems, Inc. v. Delfino, supra,* 106 Cal.4th at p. 192.) If, however, a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits.

*Paul's* interpretation of section 425.16 has been unanimously accepted in the Court of Appeal. (See, e.g., *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 621 [ 37 Cal.Rptr.3d 632] ["[I]f the defendant concedes the conduct complained of was illegal, the defendant will be unable to make a prima facie showing the action arises from protected activity within the meaning of section 425.16"]; *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty U.S.A., Inc.* (2005) 129 Cal.App.4th 1228, 1246 [ 29 Cal.Rptr.3d 521] ["If the defendant *concedes* or the evidence *conclusively establishes* the conduct complained of was illegal, as a matter of law the defendant cannot make a prima facie showing the action arises from protected activity within the meaning of section 425.16"]; *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584 [ 132 Cal.Rptr.2d 789] [Noting *Paul* "explicitly recognized that the validity of defendant's act comes into play in the second stage of the statutory analysis. [Citation.] It held, however, that the defendants, having admitted engaging in *illegal* campaign contributions (the subject of the suit), had established that their acts had not been in furtherance of their constitutional rights"]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317, fn. 3 [ 126 Cal.Rptr.2d 516] ["It is not argued that the illegality of Banks' petitioning activity has been effectively conceded, or conclusively established by the evidence"]; *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 459 [ 125 Cal.Rptr.2d 534] ["Here, in contrast [to *Paul*], appellant neither has conceded nor does the evidence conclusively establish the illegality of its communications made during the course of debate on political issues"]; *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1090 [ 114 Cal.Rptr.2d 825] ["A limited exception to the rule precluding a court from determining the
317  validity *317 of the asserted constitutional right in the first step of the anti-SLAPP analysis applies only where the defendant indisputably concedes the claim arose from illegal or constitutionally unprotected activity"].)

*Paul* also finds support in our decision in the companion case of *Soukup v. Hafif,* which examines section 425.18. Section 425.18 exempts from the anti-SLAPP statute "'SLAPPback[s]' . . . any cause of action for malicious prosecution or abuse of process arising from the filing or maintenance of a prior cause of action that has been dismissed pursuant to a special motion to strike under section 425.16" (§ 425.18, subd. (b)(1)) — if

assertedly protected activity when that activity is illegal as a matter of law and, for that
reason, not protected by the First Amendment. (See, e.g., *Paul[, supra,]* 85 Cal.App.4th
1356 [ 102 Cal.Rptr.2d 864], disapproved on other grounds in *Equilon Enterprises v.
Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5." ( *Soukup v. Hafif, supra,* 39
Cal.4th at p. 284.)[7]

> [7]  Section 425.18 does not apply in this case because Flatley's action does not fit the definition of
> a SLAPPback in that it is not an action for malicious prosecution or abuse of process and
> because Robertson's underlying action was not dismissed as a SLAPP.

We agree with *Paul* that section 425.16 cannot be invoked by a defendant whose assertedly
protected activity is illegal as a matter of law and, for that reason, not protected by
constitutional guarantees of free speech and petition. A contrary rule would be inconsistent
with the purpose of the anti-SLAPP statute as revealed by its language. ( *Paul, supra,* 85
Cal.App.4th at p. 1365 ["[T]he activity of which plaintiff complains . . . was not a *valid*
activity undertaken by defendants in furtherance of their constitutional right [to] free
speech"].) Moreover, it would eviscerate the first step of the two-step inquiry set forth in the
statute if the defendant's mere assertion that his underlying activity was constitutionally
protected sufficed to shift the burden to the plaintiff to establish a probability of prevailing
where it could be conclusively shown that the defendant's underlying activity was illegal
and not constitutionally protected. While a defendant need only make a prima facie
showing that the underlying activity falls within the ambit of the statute, clearly the statute
envisions that the courts do more than simply rubberstamp such assertions before moving
on to the second step. ( *Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 819 ["[I]t is
fundamentally fair that before putting the plaintiff to the burden of establishing probability
of success on the merits the defendant be required to show imposing that burden is justified
318  by the *318 nature of the plaintiff's complaint"].) Furthermore, as the Attorney General
points out in his amicus curiae brief, "[i]f the courts rule that a defendant who has engaged
in indisputably illegal behavior . . . has met the first step of the motion to strike, the
defendant can then shift the burden to the plaintiff and force his victim to [marshal] and
present evidence early in the litigation before the commencement of full discovery. . . . [I]f
the plaintiff/victim is unable to show a probability of prevailing, he will have to pay the
defendant's attorneys fees. (See § 425.16, subd. (c).) These are . . . grossly unfair burdens to
impose on a plaintiff who is himself the victim of the defendant's criminal activity."

Citing *Navellier v. Sletten* (2002) 29 Cal.4th 82 [ 124 Cal.Rptr.2d 530, 52 P.3d 703]
*(Navellier)*, Mauro argues that any claimed illegitimacy of defendant's assertion of
protected rights in a motion to strike under section 425.16 must be decided under the
second step of the statutory inquiry, which requires plaintiffs to show their action has
"minimal merit." ( *Navellier,* at p. 89.) *Navellier,* however, is not dispositive of the issue
before us.

In *Navellier,* the plaintiffs sued the defendant in federal court alleging breach of fiduciary
duty in connection with the defendant's management of an investment company established
by the plaintiffs. While the federal action was pending, the parties entered into an
agreement that included a release of claims that the defendant signed. Subsequently,
however, when the plaintiffs amended their complaint in the federal action, the defendant

10/14/21, 5:08 PM                                          Flatley v. Mauro, 39 Cal.4th 299 | Casetext

While the federal appeal was pending, the plaintiffs filed a state action "alleging that [the defendant] had committed fraud in misrepresenting his intention to be bound by the Release, so as to induce plaintiffs to incur various litigation costs in the federal action that they would not have incurred had they known [the defendant's] true intentions. Plaintiffs also alleged that [the defendant] had committed breach of contract by filing counterclaims in the federal action." ( *Navellier, supra,* 29 Cal.4th at p. 87.) The defendant filed a motion to strike the complaint as a SLAPP. The trial court denied the motion and the Court of Appeal affirmed. We reversed.

The principal issue in *Navellier* was whether the plaintiffs' causes of action for fraud and breach of contract arose from acts in furtherance of the defendant's exercise of protected
319 speech or petition rights. We concluded that *319 they did. We observed that the fraud claim was based on the defendant's "negotiation, execution, and repudiation of the Release" which "limited the types of claims that [the defendant] was allowed to file in the federal action," and that the "plaintiffs relied on the Release" when they moved to dismiss the defendant's counterclaims. ( *Navellier, supra,* 29 Cal.4th at p. 90.) Thus, the defendant's "negotiation and execution of the Release . . . involved 'statements' or writing[s] made in connection with an issue under consideration or review by a . . . judicial body' (§ 425.16, subd. (e)(2)), i.e., the federal district court, and his arguments respecting the Release's validity were 'statements' or writing[s] made before a . . . judicial proceeding' ( *id.,* subd. (e)(1)), i.e., the federal action." ( *Ibid.*) Similarly, we concluded that the plaintiffs' breach of contract cause of action involved activity protected by the anti-SLAPP statute because it was based on the defendant's filing of his counterclaims in the federal action. "A claim for relief filed in federal district court indisputably is a 'statement or writing made before a . . . judicial proceeding.'" ( *Ibid.*)

Only at the end of our analysis did we address the plaintiffs' claim that "the anti-SLAPP statute does not apply to this action because any petitioning activity on which it was based was not 'valid.'" ( *Navellier, supra,* 29 Cal.4th at p. 94.) The precise argument, as summarized in the dissent, was that "[t]he breach of contract claim is not a SLAPP because [the defendant] had exchanged his right to sue through the release for consideration, and thus his petitioning was not a 'valid exercise' of that right." ( *Id.* at p. 97 (dis. opn. of Brown, J.).) The majority disagreed. "That the Legislature expressed a concern in the statute's preamble with lawsuits that chill the valid exercise of First Amendment rights does not mean that a court may read a separate proof-of-validity requirement into the operative sections of the statute. [Citations.] Rather, any 'claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' ( *Paul[, supra,]* 85 Cal.App.4th 1356, 1367, 102 Cal.Rptr.2d 864.)" ( *Id.* at p. 94.) We concluded that a defendant is not required to establish that its actions are constitutionally protected as a matter of law because such a requirement would render the second prong of the anti-SLAPP statute "'superfluous.'" ( *Id.* at p. 95.)

*Navellier* did not consider whether or how the anti-SLAPP statute applies to a defendant whose assertedly protected activity is conclusively demonstrated to be illegal as a matter of law. *Navellier* was concerned with the threshold showing a defendant is required to make to

opinion regarding *Paul's* conclusion that the anti-SLAPP statute does not apply in those rare cases where the defendant's assertedly protected speech or petitioning activity is conclusively demonstrated to have been illegal as a matter of law.

"A decision, of course, does not stand for a proposition not considered by the court." ( *Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 [ 14 Cal.Rptr.3d 857, 92 P.3d 350].) Accordingly, *Navellier's* holding — that the anti-SLAPP statute does not require the defendants who bring motions to strike under section 425.16 to prove their asserted exercise of protected speech or petition rights was valid as a matter or law — is not dispositive of the question presented here of whether a defendant whose underlying conduct is conclusively demonstrated to have been illegal as a matter of law, and thus unprotected by the federal and state constitutional speech and petition guarantees, is foreclosed from invoking the anti-SLAPP statute in the first instance.

We conclude, therefore, that where a defendant brings a motion to strike under section 425.16 based on a claim that the plaintiffs action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action. In reaching this conclusion, we emphasize that the question of whether the defendant's underlying conduct was illegal as a matter of law is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing, and the showing required to establish conduct illegal as a matter of law — either through defendant's concession or by uncontroverted and conclusive evidence — is not the same showing as the plaintiff's second prong showing of probability of prevailing. With this understanding, we turn to Mauro's claim that even conduct illegal as a matter of law is protected by the anti-SLAPP statute if it is protected by the litigation privilege. (Civ. Code, § 47, subd. (b).)

3. *The Litigation Privilege and Section 425.16*

Mauro argues: "All litigation-related speech, lawful or not, is in furtherance of petition or free speech rights." Thus, he argues, even assuming his letter was extortion , it is

321 nonetheless protected by Code of Civil Procedure *321 section 425.16 because it falls within subdivision (e)(1) and (2).[8] In advancing this argument, he invokes the litigation privilege set forth in Civil Code section 47, subdivision (b). He argues, first, that section 425.16 protects litigation communication to the same degree that such communication is protected by the litigation privilege and then reasons from this premise that section 425.16 must also protect unlawful litigation-related communication because the litigation privilege does.[9] He claims *Paul* is inapplicable to this case because it did not involve litigation-related communications protected by section 425.16, subdivision (e)(1) or (2) but, rather, noncommunicative conduct protected by subdivision (e)(4).[10] We disagree.

---

[8] Section 425.16, subdivision (e) provides as follows: "(e) As used in this section, `act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official

10/14/21, 5:08 PM                                     Flatley v. Mauro, 39 Cal.4th 299 | Casetext

casetext    CARA A.I.          extortion                          JX    §    PS ? ✓

Results  ‹  ›               Flatley v. Mauro    Copy Cite                                    ℚ

Read    Analyses 8    Briefs 40    Citing Cases 1k

the constitutional right of free speech in connection with a public issue or an issue of public interest."

9   Civil Code section 47, subdivision (b) states in relevant part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. . . ."

10   Mauro argues that *Paul* is inapplicable to this case because *Paul* involved activity that falls within section 425.16, subdivision (e)(4) — "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" — rather than subdivision (e)(1) — "any written or oral statement or writing made before a . . . judicial proceeding," under which Mauro purports to seek the shelter of the anti-SLAPP statute. As Flatley points out, Mauro's motion to strike was not based on subdivision (e)(2) but on an assertion that his "prelitigation communicative efforts to reach a settlement of his client's claims . . . are protected by section *425.16(e)(1) and (e)(4)*." Mauro may not change his theory of the case for the first time on appeal. ( *Estate of Westerman* (1968) 68 Cal.2d 267, 278-279 [ 66 Cal.Rptr. 29, 437 P.2d 517].) Moreover, the premise of Mauro's argument — that all prelitigation communication is protected by subdivision (e)(2) even if it includes constitutionally unprotected speech, like extortionate speech, because the speech was uttered in the context of litigation conflates the litigation privilege with the anti-SLAPP statute in a manner we reject for the reasons set forth above. His argument is also profoundly inconsistent with the basic purpose of the anti-SLAPP statute to prevent the chilling of "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" "through abuse of the judicial process." (§ 425.16, subd. (a).)

"The principal purpose of [Civil Code] section [47, subdivision (b)] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." ( *Silberg v. Anderson* (1990) 50 Cal.3d 205, 213 [ 266 Cal.Rptr. 638,

322   *322 786 P.2d 365].) Additionally, the privilege promotes effective judicial proceedings by encouraging "'open channels of communication and the presentation of evidence'" without the external threat of liability ( *ibid.),* and "by encouraging attorneys to zealously protect their clients' interests." ( *Id.* at p. 214.) "Finally, in immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." ( *Ibid.)*

To accomplish these objectives, the privilege is an 'absolute' privilege, and it bars all tort causes of action except a claim of malicious prosecution." ( *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360 [7 Cal.Rptr.3d 803, 81 P.3d 244].) The litigation privilege has been applied in "numerous cases" involving "fraudulent communication or perjured testimony." ( *Silberg v. Anderson, supra,* 50 Cal.3d at p. 218; see, e.g., *Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 20, 22-26 [ 116 Cal.Rptr.2d 583] [attorney's misrepresentation of available insurance policy limits to induce the settlement of a lawsuit];

10/14/21, 5:08 PM                              Flatley v. Mauro, 39 Cal.4th 299 | Casetext

casetext    CARA A.I.    [ extortion ]    JX  🔍      §    PS  ❓ ✅

Results  ‹  ›                    Flatley v. Mauro   Copy Cite

📄 🖨 📁 ✉  •••Read   Analyses 8   Briefs 40   Citing Cases 1k

sent in the course of judicial proceedings allegedly defaming his client].) The privilege has also been held to apply to "statements made prior to the filing of a lawsuit." ( *Hagberg v. California Federal Bank, supra,* 32 Cal.4th at p. 361.) Seizing upon these principles, Mauro maintains that section 425.16 similarly protects any prelitigation-related communication even if that communication constitutes extortion .[11] (10) Assuming without deciding that the litigation privilege may apply to such threats, we conclude that they are nonetheless not protected under the anti-SLAPP statute because the litigation privilege and the anti-SLAPP statute are substantively different statutes that serve quite different purposes, and it is not consistent with the language or the purpose of the anti-SLAPP statute to protect such threats.

> [11] Flatley asserts that, even if Mauro's communications could be deemed prelitigation communication, prelitigation conduct does not fall within the ambit of section 425.16. We have concluded otherwise. ( *Briggs v. Eden Council for Hope Opportunity, supra,* 19 Cal.4th at p. 1115 ["' communications preparatory to or in anticipation of bringing an action or other official proceeding'" are protected by section 425.16].)

There is, of course, a relationship between the litigation privilege and the anti-SLAPP 323  statute. Past decisions of this court and the Court of Appeal have *323  looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry — that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivision (e)(1) and (2).

For example, in *Briggs v. Eden Council for Hope Opportunity, supra,* 19 Cal.4th 1106, we declined to read into section 425.16, subdivision (e)(1) and (2), which protects statements made before, or in connection with, an issue pending before an official proceeding, a further requirement that the statements concern an issue of public significance. In so holding, we observed that imposing a "'public issue' requirement" as a condition to protecting litigation-related communications under the anti-SLAPP statute would produce an "anomalous result." ( *Briggs v. Eden Council for Hope Opportunity, supra,* 19 Cal.4th at p. 1121.) Litigation-related communications that did not involve a public issue would not be protected under the anti-SLAPP statute but would nonetheless be privileged under the litigation privilege, and protected by state and federal constitutional guarantees of the right of petition. ( *Ibid.*) Thus, in *Briggs,* we bolstered our interpretation of the scope of the protection afforded to litigation-related communications under the anti-SLAPP statute by looking at whether our result was consistent with the scope of the protection afforded to such communications by the litigation privilege. Nowhere in *Briggs,* however, did we suggest, much less hold, that the scope of those protections is identical in every respect.

The litigation privilege is also relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing. (See, e.g., *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926-927 [ 120 Cal.Rptr.2d 576] [where the plaintiff's defamation action was barred by Civil Code section 47, subdivision (b), the plaintiff cannot demonstrate a probability of prevailing under the anti-SLAPP statute]; *Dove Audio, Inc. v. Rosenfeld, Meyer Susman* (1996) 47 Cal.App.4th

casetext   CARA A.I.   extortion                    JX   🔍        §      PS  ❓  ✅

Results   ‹   ›              Flatley v. Mauro   Copy Cite

📄 🖨 📁 📧 •••Read   Analyses 8   Briefs 40   Citing Cases 1K

*Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th 728, we declined to create a categorical exemption from section 425.16 for malicious prosecution actions even though such claims are exempt from the litigation privilege. We rejected the plaintiff's "attempted analogy between the litigation privilege and the anti-SLAPP statute" as "inapt," explaining "the litigation privilege is an entirely different type of statute than section 425.16. *324 The former enshrines a substantive rule of law that grants absolute immunity from tort liability for communications made in relation to judicial proceedings [citation]; the latter is a procedural device for screening out meritless claims [citation]." ( *Jarrow Formulas, Inc.,* at p. 737.)

Nor do the two statutes serve the same purposes. The litigation privilege embodied in Civil Code section 47, subdivision (b) serves broad goals of guaranteeing access to the judicial process, promoting the zealous representation by counsel of their clients, and reinforcing the traditional function of the trial as the engine for the determination of truth. Applying the litigation privilege to some forms of unlawful litigation-related activity may advance those broad goals notwithstanding the "occasional unfair result" in an individual case. ( *Silberg v. Anderson, supra,* 50 Cal.3d at p. 214; *Doctors' Co. Ins. Services v. Superior Court, supra,* 225 Cal.App.3d at p. 1300 [the litigation privilege applies to subornation of perjury because "it is in the nature of a statutory privilege that it must deny a civil recovery for immediate wrongs — sometimes even serious and troubling ones — in order to accomplish what the Legislature perceives as a greater good"].)

Section 425.16 is not concerned with securing for litigants freedom of access to the judicial process. The purpose of section 425.16 is to protect the valid exercise of constitutional rights of free speech and petition from the abuse of the judicial process (§ 425.16, subd. (a)), by allowing a defendant to bring a motion to strike any action that arises from any activity by the defendant in furtherance of those rights. (§ 425.16, subd. (b)(1).) By necessary implication, the statute does not protect activity that, because it is illegal, is not in furtherance of constitutionally protected speech or petition rights. ( *Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 819 ["If the defendant's act is not constitutionally protected how can doing the act be 'in furtherance' of the defendant's constitutional rights?"].) Thus, the rationale for applying the litigation privilege to some forms of illegal conduct — like perjury — because the occasional bad result is justified by the larger goal of access to the judicial process is simply not transferable to the anti-SLAPP statute because the latter statute does not promote the same goals as the former. Moreover, by its very terms, section 425.16 does not apply to activity that is not in furtherance of the constitutional rights of free speech or petition and this would necessarily include illegal activity that falls outside protected speech and petition rights. (See *Wilcox,* at p. 820 [the anti-SLAPP statute would not apply to a defendant's act of burning down a developer's office as a political protest].)

Conversely, Civil Code section 47 states a statutory privilege, not a constitutional protection. As we recognized in *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss* 325 *Karma, Inc.* (1986) 42 Cal.3d 1157 *325 [ 232 Cal.Rptr. 567, 728 P.2d 1202], that statutory privilege is specific and limited in nature. In *Oren,* we concluded that while Civil Code section 47 prohibited an action based on a party's statements made during settlement

never been thought to bar the *evidentiary* use of every 'statement or publication' made in the course of a judicial proceeding. . . ." ( *Oren*, at p. 1168.)

By parity of reasoning, Civil Code section 47 does not operate as a limitation on the scope of the anti-SLAPP statute. The fact that Civil Code section 47 may limit the liability of a party that sends to an opposing party a letter proposing settlement of proposed litigation does not mean that the settlement letter is also a protected communication for purposes of section 425.16.[12] Therefore, we reject Mauro's contention that, because some forms of illegal litigation-related activity may be privileged under the litigation privilege, that activity is necessarily protected under the anti-SLAPP statute.

> [12] Mauro cites *Blanchard v. DIRECTV* (2004) 123 Cal.App.4th 903 [ 20 Cal.Rptr.3d 385], to establish that the anti-SLAPP statute applies to prelitigation demand letters that are extortionate because such letters are protected by the litigation privilege. In *Blanchard* the plaintiffs received letters from DIRECTV, a satellite television programming provider, explaining that use of illegal equipment purchased by the plaintiffs that unscrambled DIRECTV'S signal violated federal law and offering an opportunity to resolve the matter before commencement of suit. ( *Id.* at pp. 909-910.) Thereafter, the plaintiffs sued DIRECTV alleging that the mailing of the demand letters constituted an unfair business practice (Bus. Prof. Code, § 17000), violated their civil rights, and constituted extortion . DIRECTV filed a motion to strike the lawsuit as a SLAPP and prevailed. As relevant here, DIRECTV argued, and the Court of Appeal agreed, that the demand letters were privileged under the litigation privilege as prelitigation communication and, therefore, the plaintiffs could not establish a probability of prevailing under the second prong of the anti-SLAPP statute. ( *Blanchard, supra,* 123 Cal.App.4th at pp. 918-922.) Thus, *Blanchard* did not involve the question of whether the demand letter was extortion as a matter of law and thus unprotected by the First Amendment so as to bar DIRECTV from using the anti-SLAPP statute to strike the plaintiffs' action. Rather, the plaintiffs conceded that their lawsuit arose from DIRECTV's protected petitioning activity. ( *Id.* at p. 918.) Accordingly, *Blanchard* is irrelevant to the issues presented here.

**B.** *Mauro's Assertedly Protected Conduct Was Criminal Extortion as a Matter of Law and Was Undeserving of the Protection of the Anti-SLAPP Statute.*

*1. Standard of Review*

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. 326 ( *Sylmar Air Conditioning v. Pueblo Contracting Services,* *326 Inc.* (2004) 122 Cal.App.4th 1049, 1056 [ 18 Cal.Rptr.3d 882].) We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b) (2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' ( *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [ 12 Cal.Rptr.3d 786].)" ( *Soukup v. Hafif, supra,* 39 Cal.4th at p. 269, fn. 3.)

*2. Extortion*

another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat." (Pen. Code, § 523.)

E xtortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal. "[I]n many blackmail cases the threat is to do something in itself perfectly legal, but that threat nevertheless becomes illegal when coupled with a demand for money." ( *Philippine Export Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1079 [ 267 Cal.Rptr. 457].)[13] The extortion statutes "all adopted at the same time and relating to the same subject matter, clearly indicate that the legislature in denouncing the wrongful use of fear as a means of obtaining property from another had in mind threats to do the acts specified in section 519, the making of which for the purpose stated is declared to be a wrongful use of fear induced thereby." ( *People v. Beggs* (1918) 178 Cal. 79, 83 [ 172 P. 152].) "It is the means employed [to obtain the property of another] which the law denounces, and though the purpose may be to collect a just indebtedness arising from and created by the criminal act for which the threat is to prosecute the wrongdoer, it is nevertheless within the statutory inhibition. The law does not contemplate the use of criminal process as a means of collecting a debt." ( *Id.*
327   at p. 84; see *People v. Tufunga* (1999) 21 Cal.4th 935, 955 [ 90 Cal.Rptr.2d 143, *327 987 P.2d 168] [in *Beggs* "we explained that the strong public policy militating against self-help by force or fear, courts will not recognize a good faith defense to the satisfaction of a debt when accomplished by the use of force or fear"]; *Lindenbaum v. State Bar* (1945) 26 Cal.2d 565, 573 [ 160 P.2d 9] [for purposes of extortion "[i]t is immaterial that the money which petitioner sought to obtain through threats may have been justly due him"]; *Gomez v. Garcia* (9th Cir.1996) 81 F.3d 95, 97 ["The law of California was established in 1918 that belief that the victim owes a debt is not a defense to the crime of extortion "].)

   13  In popular parlance extortion is "sometimes called `blackmail.'" ( *People v. Sales* (2004) 116 Cal.App.4th 741, 748 [ 10 Cal.Rptr.3d 527].)

Moreover, threats to do the acts that constitute extortion under Penal Code section 519 are extortionate whether or not the victim committed the crime or indiscretion upon which the threat is based and whether or not the person making the threat could have reported the victim to the authorities or arrested the victim. ( *People v. Sanders* (1922) 188 Cal. 744, 756 [ 207 P. 380]; *People v. Goldstein* (1948) 84 Cal.App.2d 581, 587 [191 P.2d 102]; *People v. Hesslink* (1985) 167 Cal.App.3d 781, 787 [ 213 Cal.Rptr. 465].) Furthermore, the crime with which the extortionist threatens his or her victim need not be a specific crime. "[T]he accusations need only be such as to put the intended victim of the extortion in fear of being accused of some crime. The more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime." ( *People v. Sanders, supra,* at pp. 749-750; see *People v. Massengale* (1968) 261 Cal.App.2d 758, 764-765 [ 68 Cal.Rptr. 415].)

10/14/21, 5:08 PM
Flatley v. Mauro, 39 Cal.4th 299 | Casetext

provides: "A lawyer shall not present, participate in presenting, or threaten to present criminal charges or professional disciplinary actions to gain an advantage in a civil matter." (Ill. Rules Prof. Conduct, rule 1.2(e).)

In *Libarian v. State Bar* (1952) 38 Cal.2d 328 [ 239 P.2d 865], we upheld disciplinary action against Libarian who, after losing at trial, sent a letter to opposing counsel, accusing his opponent's client of perjury and threatening to use the perjury charge as the basis of a new trial motion and a criminal complaint unless opposing counsel's client paid Libarian's client. "Although no action was taken either by Libarian or Siegel to prosecute Nadel, the

328  record clearly shows conduct which is in violation of Libarian's *328 oath and duties as an attorney. The threats contained in the letter indicate an attempt to commit extortion . The sending of a threatening letter with intent to extort money is `punishable in the same manner as if such money . . . were actually obtained' (Pen. Code, § 523) and the crime of extortion involves moral turpitude." ( *Id.* at pp. 329-330; *Barton v. State Bar* (1935) 2 Cal.2d 294, 297 [ 40 P. 2d 502] [the conduct of an attorney who threatened an oil company with reporting adulteration of its gasoline to the prosecutor unless it paid his clients was not only grounds for disbarment but "constituted an attempt to extort money as said crime is defined in sections 518, 519 and 524 of the Penal Code"]; *State v. Harrington* (1969) 128 Vt. 242 [ 260 A.2d 692, 699] [attorney's suggestion in letter demanding $175,000 settlement in divorce case that he might advise his client to report husband to Internal Revenue Service and United States Custom Service constituted "veiled threats [that] exceeded the limits of respondent's representation of his client in divorce action" and supported attorney's extortion conviction].) As these cases illustrate, a threat that constitutes criminal extortion is not cleansed of its illegality merely because it is laundered by transmission through the offices of an attorney. Bearing these principles in mind, we turn to the instant case.

*3. Application*

E xtortion is not a constitutionally protected form of speech. ( *R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 420 [ 120 L.Ed.2d 305, 112 S.Ct. 2538] (conc. opn. of Stevens, J.) ["Although the First Amendment broadly protects `speech,' it does not protect the right to . . . `extort'"]; *United States v. Quinn* (5th Cir.1975) 514 F.2d 1250, 1268 ["It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all"].) The purpose of the anti-SLAPP statute, of course, is to protect "the valid exercise of the constitutional rights of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Flatley argues that the letter Mauro sent on behalf of Robertson, and his subsequent telephone calls to Flatley's attorneys, constituted extortion as a matter of law and, therefore, the trial court correctly dismissed Mauro's motion to strike Flatley's action as a SLAPP. ( *Paul, supra*, 85 Cal.App.4th at pp. 1366-1367.) Mauro maintains that his activity on behalf of Robertson amounted to no more than the kind of permissible settlement negotiations that are attendant upon any legal dispute or, at minimum, that a question of fact exists regarding the legality of his conduct precluding a finding that it was illegal as a matter of law. We review the question de novo. ( *Soukup v. Hafif, supra*, 39 Cal.4th at p. 269, fn. 3.)

that is not contradicted."].)

At the core of Mauro's letter are threats to publicly accuse Flatley of rape and to report and publicly accuse him of other unspecified violations of various laws unless he "settled" by paying a sum of money to Robertson of which Mauro would receive 40 percent. In his followup phone calls, Mauro named the price of his and Robertson's silence as "seven figures" or, at minimum, $1 million. The key passage in Mauro's letter is at page 3 where Flatley is warned that, unless he settles, "an in-depth investigation" will be conducted into his personal assets to determine punitive damages and this information will then " **BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT. . . . [¶] Any and all information, including Immigration, Social Security Issuances and Use, and IRS and various State Tax Levies and information will be exposed.** We are positive the media worldwide will enjoy what they find." This warning is repeated in the fifth paragraph: " **[A]ll pertinent information and documentation, if in violation of any U.S. Federal, Immigration, I.R.S., S.S. Admin., U.S. State, Local, Commonwealth U.K., or International Laws, shall immediately [be] turned over to any and all appropriate authorities.**" Finally, Flatley is warned that once the lawsuit is filed additional causes of action "shall arise" including "Defamatory comments, Civil Conspiracy, Reckless Supervision" which are "just the beginning" and that "ample evidence" exists "to prove each and every element for all these additional causes of action. Again, these actions allow for **Punitive Damages.**"

At the top of the final page of the letter is the caption: " **FIRST FINAL TIME-LIMIT SETTLEMENT DEMAND** " Beneath it a paragraph warns that there shall be " **no continuances nor any delays.**" At the bottom of the page, beneath Mauro's signature, a final paragraph warns Flatley that, along with the filing of suit, press releases will be disseminated to numerous media sources and placed on the Internet.

In his first telephone conversation with Brandon, Mauro gave Flatley a deadline of the end of the month "to offer sufficient payment," apparently without any further discussion of the particulars of Robertson's claim. In his call to Brandon, one week after he sent the letter, Mauro complained that he had not yet heard from Flatley and told Brandon he would not extend the *330 deadline and "I know the tour dates; I am not kidding about this it will be publicized every place he [Mr. Flatley] goes for the rest of his life," and that dissemination of the story "would be immediate to any place where he and the troupes are performing everywhere in the world." The very next day, January 10, Mauro called Brandon again and, after leaving a message threatening to "go public" if Brandon did not return his call within a half-hour, Mauro "complained that people were investigating the matter before contacting him and were doing so in an intimidating manner. He said that, if he did not receive a call by 8:00 p.m. Central Standard Time that night from a representative of Mr. Flatley with authority, he would `go public and the January 30 deadline is gone.' He said, T already have the news media lined up' and would `hit him [Mr. Flatley] at every single place he tours.'"

Later that day, when Fields spoke to Mauro, Mauro told him "he knew how to play `hardball' and that, if Mr. Flatley did not pay an acceptable amount, they would `go public,' would see that their story would follow him wherever he or his groups performed and

"accuse" Flatley of, or "impute to him," "crime[s]" and "disgrace" (Pen. Code, § 519, subds. 2, 3) unless Flatley paid Mauro a minimum of $1 million of which Mauro was to receive 40 percent. That the threats were half-couched in legalese does not disguise their essential character as extortion . ( *Librarian v. State Bar, supra,* 38 Cal.2d at pp. 329-330; *State v. Harrington, supra,* 260 A.2d at p. 699.)

Mauro's letter accuses Flatley of rape and also imputes to him other, unspecified violations of various criminal offenses involving immigration and tax law as well as violations of the Social Security Act. With respect to these latter threats, Mauro's letter goes on to threaten that "[w]e are positive the media worldwide will enjoy what they find." Thus, contrary to Mauro's claim that he did nothing more than suggest that, if evidence of other criminal conduct became public knowledge it would receive media attention, the letter implies that Mauro is already in possession of information regarding such criminal activity and is prepared to disclose this information to the "worldwide" media. Whether Flatley in fact committed any violations of these various laws is irrelevant. ( *People v. Goldstein, supra,* 84 Cal.App.2d at p. 587 [for purposes of extortion , "[a] false accusation of crime is often as harmful as one that is true"].) Moreover, the threat to disclose criminal activity entirely
331 unrelated to any alleged injury suffered by Mauro's client "exceeded *331 the limits of respondent's representation of his client" and is itself evidence of extortion . ( *State v. Harrington, supra,* 260 A.2d at p. 699 [attorney's veiled threat to have his client in a divorce action inform on her husband to the Internal Revenue Service and Bureau of Immigration and Naturalization supports attorney's conviction of extortion ].) That Mauro did not specify these other criminal offenses is of no import — "the accusations need only be such as to put the intended victim of the extortion in fear of being accused of some crime." ( *People v. Sanders, supra,* 188 Cal. at p. 749.) Indeed, the very vagueness of the accusation serves the dual purpose of "magnifying the fear of his victim" and "protect[ing]" the extortionist "in the event of the failure to accomplish his extortion and . . . prosecution." ( *People v. Massengale, supra,* 261 Cal.App.2d at p. 765.)

Mauro also threatened to accuse Flatley of raping Robertson unless he paid for her silence. Mauro argues that this threat cannot be the basis of a finding of extortion because Robertson had already reported the rape to the Las Vegas Police Department by the time the letter was sent. In the circumstances of this case, we reject his argument for the following reasons. We begin by examining the pleadings. (§ 425.16, subd. (b)(2).) Flatley's complaint alleged that the purpose of Robertson's telephone call to the Las Vegas Police Department was not to file an actual crime report but simply to "create a `sham' record of a police report that would make her threats more ominous. . . . [S]he wanted to prevent the police from taking any action that might make the matter public, since any public report of police action would necessarily spoil Robertson's scheme to extort a payment from [Flatley] to avoid such publicity."[15]

[15] We also observe that Mauro did not submit any declarations in support of his motion to strike that verified that a rape actually occurred.

10/14/21, 5:08 PM                                                    Flatley v. Mauro, 39 Cal.4th 299 | Casetext

return to Las Vegas to pursue her complaint because she was too traumatized — support the conclusion that whatever complaint Robertson made to the Las Vegas police was insufficient to trigger a police investigation. Mauro's declaration did not deny that he was aware that the Las Vegas police had not launched an investigation into Robertson's allegations when he sent the letter to Flatley. Yet, the letter was careful to include the number of a police report made to the Las Vegas Police Department as if to hold a police investigation over Flatley's head. Thus, as Flatley alleges, the incomplete police report

332   appears to have existed only to make the threat of disclosure *332 more ominous and the need to "settle" with Robertson and Mauro all the more urgent. Under these circumstances, the fact that Robertson may have made some report to the police did not render her threat to publicly accuse Flatley of rape unless he paid her and Mauro any less extortionate. ( *People v. Umana* (2006) 138 Cal.App.4th 625, 640 [ 41 Cal.Rptr.3d 573] ["Although section 519, subdivision 2, speaks in terms of *accusing* the victim of a crime, there is no reasonable basis for drawing a distinction between the initial accusation of a crime and continued pursuit of a criminal charge"].)

Moreover, in addition to the threats to accuse Flatley publicly of rape and violations of other laws, Mauro also alleged that he had in his possession "ample evidence" to support claims against Flatley for defamation and civil conspiracy and that these were "just the beginning." At minimum, these were threats that Flatley would be exposed to various kinds of opprobrium and he would be disgraced thereby unless he met Mauro's demands. (Pen. Code, § 519, subd. 3 [threat "to impute" "disgrace" sufficient to establish extortion ].)

Lastly, any doubt as to extortionate character of the letter is dispelled by the accounts from Brandon and Fields of Mauro's telephone calls to them within a week of having sent the letter. In his very first conversation with Brandon, Mauro did not discuss the particulars of the claim or express an interest in negotiations but simply stated a deadline for Flatley "to offer sufficient payment." In a followup phone call, he objected to Flatley's investigation of Robertson's allegation and threatened to withdraw the January 30 deadline, thus further demonstrating that it was never his intention to engage in settlement negotiations. Instead, the insistent theme of his conversations with Flatley's lawyers is the immediate and extensive threat of exposure if Flatley failed to make a sufficient offer of money. This culminates in Mauro's threat to "go public" and "ruin" Flatley if the January 30 deadline was not met. We conclude that Mauro's conduct constituted criminal extortion as a matter of

333   law in violation of Penal Code sections 518, 519 and 523.[16] *333

16   We emphasize that our conclusion that Mauro's communications constituted criminal extortion as a matter of law are based on the specific and extreme circumstances of this case. Extortion is the threat to accuse the victim of a crime or "expose, or impute to him . . . any deformity, disgrace or crime" (Pen. Code, § 519) accompanied by a demand for payment to prevent the accusation, exposure, or imputation from being made. Thus, our opinion should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion . ( *Philippine Export Foreign Loan Guarantee Corp. v. Chuidian, supra*, 218 Cal.App.3d at p. 1079 ["a person, generally speaking, has a perfect right to prosecute a lawsuit in good faith, or to provide information to newspapers"].) Nor is extortion committed by an employee who threatens to

10/14/21, 6:08 PM                                    Flatley v. Mauro, 39 Cal.4th 299 | Casetext

for purposes of section 425.16, we further conclude that the trial court did not err when it denied Mauro's motion to strike.

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

WERDEGAR, J., Concurring.

I agree with the majority that defendant does not enjoy the protection of the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16.)[1] I therefore concur in the judgment affirming the Court of Appeal. In moving to strike this action, it was defendant's initial burden to demonstrate the anti-SLAPP statute's applicability by showing the lawsuit arises from protected speech or petitioning. ( *Id.,* subds. (b)(1), (e); *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [ 12 Cal.Rptr.3d 54, 87 P.3d 802].) This he failed to do. Insofar as the gravamen of plaintiff's claim is that defendant attempted to extort money from him by threatening, through "various kinds of opprobrium" (maj. opn., *ante,* at p. 332), to ruin plaintiff's reputation and encourage prosecutorial authorities to pursue plaintiff (see especially *id.* at pp. 309-311, 329-332), the action does *not* arise from protected speech and petitioning.

[1]   Unlabeled section references are to the Code of Civil Procedure.

The majority details plaintiffs evidentiary submissions opposing defendant's anti-SLAPP motion. (Maj. opn., *ante,* at pp. 306-311.) These describe what the operative second amended complaint alleges: a "vicious and criminal scheme" by defendant and others "to extort money from plaintiff by asserting demonstrably false claims of sexual misconduct by plaintiff and threatening to publicize those false claims throughout the world, so as to 'ruin' plaintiff, if he would not pay the money . . . demanded." Defendant, the complaint explicitly alleges, "participated in seeking to extort money from plaintiff by this malicious, oppressive, and criminal scheme" involving "threats to ruin him with widespread and continuing publication of . . . false claims of rape not only currently, but also whenever, in the future, he or his dance troupe would perform and . . . threats to bring about plaintiff's 334 criminal *334 prosecution" for rape. As the majority points out, defendant's scheme included threats "that if [plaintiff] did not pay an acceptable amount, he . . . would 'go public'" and "would ensure that the story would follow [plaintiff] . . . and would 'ruin' him." (Maj. opn., *ante,* at p. 311.) That plaintiff alleges the extortion scheme also included threats to sue ( *id.* at pp. 307-309) does not necessarily mean the action "arises from" defendant's litigation-related activities. ( *Kajima Engineering Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 930-931 [ 116 Cal.Rptr.2d 187] [mere presence of allegations in city's cross-complaint that contractor extorted money, inter alia, by filing or threatening lawsuits did not render it a SLAPP].)

Moreover, for many of the reasons the majority cites in concluding defendant's conduct was illegal as a matter of law (maj. opn., *ante,* at pp. 325-332), plaintiff plainly has demonstrated a probability that he will prevail on the claim (§ 425.16, subd. (b)(1)), bearing

https://casetext.com/case/flatley-v-mauro?q=extortion&p=1&lab=keyword&jxs=casct,caapp&sort=relevance&type=case                                          23/26



733].) Accordingly, the trial court properly denied defendant's anti-SLAPP motion.

As the foregoing disposes of the matter before us, I decline to join the majority in creating a judicial exception to the first (i.e., "arising from") prong of the anti-SLAPP statute for actions based on conduct courts determine was "illegal as a matter of law." (See § 425.16, subd. (b)(1); maj. opn., *ante,* at pp. 311-325.) Although the Legislature has embraced the concept of "illegal as a matter of law" as a limit on motions to strike so-called SLAPPback actions for malicious prosecution and abuse of process (see § 425.18, subd. (h)), it has not done so with respect to other anti-SLAPP motions and I am doubtful that our doing so is necessary or appropriate.

We previously have observed that the anti-SLAPP statute "poses no obstacle to suits that possess minimal merit." ( *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93 [ 124 Cal.Rptr.2d 530, 52 P.3d 703].) Accordingly, we have rejected, as contrary to the legislative design ( *id.* at p. 94), any suggestion that in order to invoke the special motion to strike, i.e., to satisfy the statute's first prong, a "defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law" ( *id.* at p. 95). I realize the majority's new exception does not go that far. Nevertheless, in adding to the burdens of defendants who seek anti-SLAPP protection the requirement that they first resist, on the merits, a plaintiff's assertion that the *335 conduct they are being sued for was "illegal as a matter of law" (maj. opn., *ante,* at p. 320), the majority moves in that direction. Since by definition all conduct sued upon is alleged to be illegal, the majority's assurances that the "narrow circumstance" (maj. opn., *ante,* at p. 315; see also *id.* at p. 316) for plaintiffs' invoking an illegal-as-a-matter-of-law defense to an anti-SLAPP motion will occur only in "rare cases" ( *id.* at p. 320) are not convincing.[2]

> [2] Similarly, since many torts are crimes and vice versa, I am not confident that, in branding this tort defendant's conduct "criminal extortion as a matter of law" (maj. opn., *ante,* at p. 332, fn. 16), the majority has invoked a principle easily "limited to the specific facts of this case" ( *id.* at p. 333).

Although the majority is at pains to emphasize that the question which arises under its new first-prong exception, i.e., whether the defendant's underlying conduct was illegal as a matter of law, "is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing" (maj. opn., *ante,* at p. 320), I suspect maintaining any such distinction in practice will prove difficult. The majority asserts "the showing required to establish conduct illegal as a matter of law — either through defendant's concession or by uncontroverted and conclusive evidence — is not the same showing as the plaintiff's second prong showing of probability of prevailing." ( *Ibid.*) The standard the majority articulates for its new exception, however, is virtually indistinguishable from the standard we previously have articulated for satisfying the statute's second prong.[3] The similarity may well sow doctrinal confusion among courts previously given to understand that "any `claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.'" ( *Navellier v. Sletten, supra,* 29 Cal.4th at p. 94.)[4] *336

10/14/21, 5:08 PM

Flatley v. Mauro, 39 Cal.4th 299 | Casetext

casetext   CARA A.I.   extortion   JX

Results   <   >   **Flatley v. Mauro**   Copy Cite

Read   Analyses 0   Briefs 40   Citing Cases 1k

evidence only to determine if it has defeated the plaintiff as a matter of law.
[Citation.]'" (Maj. opn., *ante*, at p. 326.) In *Wilson v. Parker, Covert Chidester, supra*, 28
Cal.4th at page 821, we cited the same subdivision in articulating the standard for deciding the
second-prong question of potential merit: "[T]he trial court considers the pleadings and
evidentiary submissions of both the plaintiff and the defendant . . .; though the court does not
*weigh* the credibility or comparative probative strength of competing evidence, it should grant
the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the
plaintiff's attempt to establish evidentiary support for the claim."

4   Nor is it clear what the consequences for the parties, going forward, are likely to be of our
declaring at this early stage of the litigation that defendant's conduct constitutes extortion as a
matter of law. (See maj. opn., *ante*, at p. 332.) The majority does not address the point.

As the majority points out, "[o]ur concern for effectuating the legislative intent as
demonstrated by the plain language of the [anti-SLAPP] statute has led us to reject attempts
to read into section 425.16 requirements not explicitly contained in that language." (Maj.
opn., *ante*, at p. 312.) For the reasons stated, I believe the majority's departure from that
337   course in the present case is unwise.[5] *337

5   The majority relies principally on *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 [
102 Cal.Rptr.2d 864], which we disapproved on other grounds in *Equilon Enterprises v.
Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, footnote 5 [ 124 Cal.Rptr.2d 507, 52 P.3d
685]. But as the majority acknowledges, *Paul* involved "'a factual context in which defendants
. . . effectively conceded the illegal nature of their . . . activities for which they [were sued].
Thus, there was no dispute on that point and [the Court of Appeal there] concluded, as a matter
of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by
section 425.16.'" (Maj. opn., *ante*, at p. 315, quoting *Paul*, at p. 1367.) Moreover, the court in
*Paul* was careful to note that, "had there been a factual dispute as to the legality of defendants'
actions, then [the court] could not so easily have disposed of defendants' motion." ( *Paul*, at p.
1367.) Here, of course, there indeed exists a factual dispute as to the legality of defendant's
actions. (See maj. opn., *ante*, at p. 306.)

338   Exhibit *338

339   Exhibit *339

340   Exhibit *340

341   Exhibit *341

Coverage

SmartCite

Public records

Partnerships and Resources

Law school

About us

Jobs

Blog

Podcast

News

https://casetext.com/case/flatley-v-mauro?q=extortion&p=1&tab=keyword&jxs=cascl,caapp&sort=relevance&type=case   25/26

10/14/21, 5:08 PM                                    Flatley v. Mauro, 39 Cal.4th 299 | Casetext

casetext          CARA A.I.        extortion                    JX   🔍      §      PS  ❓ ✓

Results  ‹  ›                  Flatley v. Mauro   Copy Cite                              🔍

···Read    Analyses 8    Briefs 40    Citing Cases 1k

Help articles

Customer support

Contact sales

Schedule training

Privacy

Terms

© 2021 Casetext Inc.

Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

EXHIBIT 3

1   Name: Fernando Gastelum
2   Address: 209 W. 9th Street
    Casa Grande, AZ 85122
3   Telephone Number: 520-560-0927
    Email: fernandog8899@gmail.com
4   *Pro se*

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9   Fernando Gastelum,                    Case No.: 1:21-cv-01230-NONE-JLT

10                      Plaintiff,         **VERIFIED OBJECTION /
                                           RESPONSE TO DEFENDANT'S**
11  vs.                                    **MOTION TO DISMISS THE
                                           COMPLAINT [sic] FOR LACK OF**
12  Tc Heritage Inn 2 of Bakersfield LLC   **STANDING**
    dba Home 2 Suites by Hilton
13  Bakersfield

14                      Defendant.
15

16                    **I.  INTRODUCTION**

17          Defendant's current Motion To Dismiss the Complaint [sic][1] for Lack of

18  Standing, ECF #16, is a verbatim cut and paste of Defendant's prior Motion To

19  Dismiss the Complaint for lack of Standing, ECF #5. The only difference is that

20  the new Motion, ECF #16, adds a declaration addressing the merits of Plaintiff's

21  claim by one Gary Layman, ECF #16-3. At the same time, Defendant again

22  requests the Court to take judicial notice of Plaintiff's litigation history, ECF #16-

23  5; the request for judicial notice has already been denied by the Court's Order,

    ECF #13.
24
            Defendant's prior Motion to Dismiss was granted by the Court on
25
    February 23, 2022 with leave to amend. ECF #13. The Order provided Plaintiff
26
    with a detailed analysis of the errors in his initial Complaint. Plaintiff studied the
27

28  ----
    [1] Probably meant to read "First Amended Complaint".

                                        1

1   Order carefully, page by page, paragraph by paragraph, line by line. Plaintiff

2   prepared and mailed the First Amended Complaint to the Court on March 1,

3   2022. ECF #15.

4   ## II. PLAINTIFF'S FIRST AMENDED COMPLAINT CORRECTED ALL
   ## DEFICIENCIES NOTED BY THE COURT

5

6   In its Order, the Court found that the allegations of barriers at the hotel

7   were not adequately described and related to Plaintiff's disability.

8   With respect to the allegation that the passenger loading zone had no

9   marked access isle, the Court noted that the existence of the passenger loading

    zone was a question of fact that had to be decided in Plaintiff's favor. *Id.* at

10  12:14-16. Nonetheless, the Court found that Plaintiff failed to allege that there

11  was in fact a passenger loading zone or that an access isle was required. *Id.* at

12  13:1-3.

13  With respect to the allegations of the ironing board and the coffee pot

14  being too high in Plaintiff's assigned room, the Court found that there was a

15  factual dispute that had to be resolved in Plaintiff's favor. *Id.* at 15:17-18.

16  With respect to the force required to open the door to the assigned room,

17  the Court found that the original complaint was insufficient because it did not

18  specify which door required a force greater than 5 lbs to open. *Id.* at 16:1-4.

19  The Court also found that Plaintiff did not sufficiently allege "deterrence."

20  The Court noted,

21      A plaintiff must allege more, such as frequency of travel to a region,
        to support a determination that he is deterred from a return due to the
22      alleged barriers. *See, e.g., Whitaker v. Ramon Bravo, Inc.,* 2021 WL
        4133871, at *4 (N.D. Cal. Sept. 10, 2021) (finding a plaintiff sufficiently
23      alleged imminent future injury based on allegations that he is an ADA
        tester who frequently travels to the Bay Area, including the Redwood
24      City area where the restaurant was located); *Rutherford v. Kelly,* 2021
        WL 488342, at *7 (S.D. Cal. Feb. 9, 2021) (finding the plaintiff's status
25      as an ADA tester and past visits to an establishment were relevant to
        the inquiry for standing purposes). Because Gastelum offers no more
26      than a conclusory statement that he does not want to revisit the hotel
        due to its alleged failure to comply with the ADA and California law,
27      he fails to allege facts sufficient to support a conclusion that he has
28

                                          2

standing due to deterrence. *See Feezor*, 608 Fed. App'x at 477; *Bakersfield Convention Hotel I*, 436 F. Supp. 3d at 1341.

*Id.* at 17:6-16.

Following a detailed review of the Order, Plaintiff corrected the deficiencies relating to the barriers in his FAC at ¶¶ 17-19[2]:

> 17.    Unfortunately, on the date of the plaintiff's visit, Plaintiff discovered that the Hotel is not compliant with the disability access laws in conformance with the ADA Standards as it relates to wheelchair users like the Plaintiff. Accordingly, Plaintiff had to use the prosthetic leg and a cane to move, open doors and reach for items. Plaintiff personally encountered and documented the following inaccessible elements at the Hotel:

> a. The Hotel has a passenger loading zone, but the loading zone had no marked access aisle. The area in front of the lobby is specifically designed or designated for passenger loading. This condition made it more difficult for Plaintiff to use the exclusive access isle loading zone and unload his wheelchair for use. This condition required Plaintiff to use the prosthesis and a cane which caused Plaintiff to suffer pain and discomfort because the condition made it more difficult for Plaintiff to enter or exit the lobby without his wheelchair. The following photograph shows the passenger loading zone and lack of a marked access isle:



---

[2] Plaintiff initially notes that the Court found that the allegations of the ironing board and the coffee pot being too high in Plaintiff's assigned room, the allegations were sufficient.

The 2010 Standards for Accessibility Design require the following marking in a passenger loading zone:

**503.3.3 Marking.** Access aisles shall be marked so as to discourage parking in them.

**Figure 503.3
Passenger Loading Zone Access Aisle**

Plaintiff does not claim that he was a passenger when he drove up to the Hotel. Plaintiff claims that he could not be a passenger because there was no exclusive access isle that he could use as a passenger. Plaintiff claims that he is aware of the lack of properly marked access isle which deters him from revisiting the Hotel.

b. The door to the assigned room required greater than 5 lbs of force to open. This condition made it difficult for me to push myself through the door. The door requires a two handed operation – one hand to operate the handle and the other to push or pull the door open. The door also required a two legged operation since both legs are required to push the body through any movable barrier. A two handed and two legged operation of the door coupled with a push force of more than 5 lbs made it more difficult for Plaintiff to enter the door either with his wheelchair or his prosthetic leg and a cane. The following photograph documents this condition:



c. ...

d. ...

e. Reach ranges for the toaster and iron were greater than 48 inches high. This condition made it more difficult for me to reach them because reaching them required a two handed operation: One hand to operate the toaster and to remove the iron, the other hand the support myself on the deck in front. Reaching the toaster and iron also required a two legged operation to approach and stand at the location of the toaster and iron. The following photograph documents this condition:



18. These barriers interfered with Plaintiff's full and equal enjoyment of the Hotel.

19. These barriers relate to and impact Plaintiff's disability both when Plaintiff stays at a hotel that is wheelchair friendly, and when he stays at the hotel that is not wheelchair friendly, such as Defendant's Hotel. Plaintiff personally encountered these barriers.

Plaintiff also supplemented the "intent to return" allegation to comply with the Order. ¶¶24-28 allege:

24. Plaintiff is often in the area where the Hotel is located.

25. Plaintiff intended to return to the Hotel in the winter of 2021/2022.

26. Plaintiff is an ADA tester who frequently travels to the Bakersfield area where the Hotel is located.

27. Plaintiff in fact went to Bakersfield in mid-January, 2022, but declined to stay at the Hotel based on his knowledge that the Hotel was not accessible.

28. Plaintiff will return to the Hotel to avail himself of its goods and services and to determine compliance with the disability access laws once it is represented to him that the Hotel is accessible. Plaintiff is currently deterred from doing so because of his knowledge of the existing barriers and his uncertainty about the existence of yet other barriers on the site. If the barriers are not removed, the plaintiff will face unlawful and discriminatory barriers again.

Plaintiff believed, and believes still, that the FAC carefully, completely and adequately corrected all prior deficiencies.

### III. MS. OVERSTREET'S DECLARATION IS DECEPTIVE

Ms. Overstreet Declaration, ECF 16-2 at p 16, contains photos purporting to show accessible iron in Plaintiff's room and the coffee pot on the lower counter. However, the Overstreet photos are of an *entirely different room!* In the comparison on the next page, Ms. Overstreet's photos of a different room and Plaintiff's photos of the actual room are compared. The first comparison is between Ms. Overstreet's photo that shows a crossbar support strap and no cabinet below the counter and the actual photo shows no crossbar support strap and a cabinet below the counter. The second comparison shows that the appliance in the Overstreet photo has no blue sticker while the appliance in the actual photo shows a blue sticker. Clearly different rooms.

The photographic comparison is on the next page.



Overstreet photo.
Cross-bar support strap.
No cabinet below counter.

Actual photo.
No cross-bar support strap.
Cabinet below counter.



Overstreet photo.
No sticker on the appliance below.



Actual photo.
Sticker on the appliance below.

## IV. MR. LAYMAN'S DECLARATION IS ALSO DECEPTIVE

The additional difference between the original Motion to Dismiss, ECF #5, and the current Motion, ECF # 16, is the addition of the Declaration of Mr. Gary Layman, ECF #16-3.

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mr. Layman states that the passenger loading zone "is an area that hotel guests would typically utilize to drop off luggage." *Id.* at ¶11, 4:3-4. Mr. Layman's statement is directly contradicted by the Motion at 8:20-24, where Mr. Stillman readily admits:

> *What constitutes a "passenger loading zone"?*
>
> Only those areas that are *specifically designed* or *designated for passenger loading* are considered "passenger loading zones" under the Standards. **This includes those passenger drop-off or pick-up areas commonly found at** airports, convention centers, schools, **and many hotel entrances that have design features,** signs, or markings **indicating passenger loading zones**. At other locations, compliance is not required even if passenger loading may occasionally occur but is not specifically intended or reflected in the design. (Italics in original, bold face added.)

Obviously, **most hotel entrances** have **common design features indicating a passenger loading zones**. Equally obviously, the area where **hotel guests would typically utilize to drop off luggage** requires a **passenger** to drop off luggage. The fact that Mr. Laymen found that "there are no signs or markings indicating a passenger loading zone in front of the lobby of the hotel the canopy area" precisely proves the point that there is no marked access isle which is a violation of the Standards at 503 referenced above. Instead of providing evidence of *no* barrier, Mr. Layman actually produces indisputable evidence of *a* barrier.

Mr. Layman then argues that the door to the assigned room is an "exterior" door that does not require the maximum 5 lbs push-pull force. *But see* ¶17(b) specifically referencing the "assigned room" and providing a photograph of it.

Mr. Layman then speculates that Plaintiff was not in a wheelchair when he attempted to reach the toaster. *Id.* at 16. This is a speculative and misleading statement. In FAC at ¶¶ 3-6, Plaintiff alleges:

3. Since 2015, Plaintiff has been using a wheelchair for mobility in locations that are designed for wheelchair use, that is, accessible routes that provide firm, level surface and that are wide enough to navigate his wheelchair.

4. Where the locations are not designed for the use of a wheelchair, that is, accessible routes do not provide firm, level surface, or are not designed for persons using a wheelchair, Plaintiff must use his prosthetic leg and a cane to move short distances.

5. Plaintiff prefers to use a wheelchair because walking on the prosthesis is painful, uncomfortable, and causes the prosthesis to rub against his skin. When Plaintiff uses the prosthetic, his leg sweats which in turn loosens the prosthetic sleeve that begins to slip back and forth. Plaintiff can no longer walk then. This requires Plaintiff to stop, remove the prosthetic leg, let the sleeve dry up, and then put the prosthetic leg back on again.

6. Even with the use of the prosthesis and a cane, Plaintiff's ability to walk, push, reach and otherwise engage in activities requiring two handed or two legged operations are severely restricted.

Mr. Layman's Declaration suggests that one way to avoid ADA liability is to make the Hotel wheelchair inaccessible, require a guest to use a prosthesis and a cane, and then argue that a barrier does not exist. This argument makes no sense.

Lastly, Mr. Layman argues that the photos of a different room provided by Ms. Overstreet show no violation. *Even if* the photos were of the same room, which they are not, the changes to the location of the iron and the coffee pot were made *after* Plaintiff's lodging at the hotel.

The photos offered by Ms. Overstreet and Mr. Layman are false evidence that should not be considered.

## V. CONCLUSION AND PRAYER FOR RELIEF

Plaintiff has previously alerted the Court to Mr. Stillman's sworn intent to have Plaintiff declared a vexatious litigant, to file Rule 11 motions against him, and to have him post a bond *unless* he dismisses this case. Mr. Stillman "strongly encourage[d] Plaintiff to take this matter seriously." ECF #7 at Exhibit 4 and Exhibit 1 here (email from Mr. Stillman to Plaintiff dated September 8, 2021).

1  Plintiff should be free of extortion like this. Defendant's current Motion to

2  Dismiss, a virtual cut and paste of the first motion, argues that the First

3  Amended Complaint that absolutely and faithfully resolves issues relating to the

4  initial Complaint, and files a deceptive Declarations of Ms. Overstreet and Mr.

5  Layman, is meritless, vexatious and groundless. While Plaintiff does not have

6  lawyer to pay, Plaintiff's time still has value. Plaintiff's life as a disabled individual

7  has value. Mr. Stillman's threats, intimidation, and the waste of everyone's time

8  must end. To that end, Plaintiff requests that the Court appropriately admonish

   Mr. Stillman.

9                                    **VI. VERIFICATION**

10         Plintiff verifies under the penalty of perjury that the above statements of fact

11  and true and accurate to the best of his knowledge and memory.

12         RESPECTFULLY SUBMITTED on March 24, 2022.

13
14  Fernando Gastelum

15  Mailed to the Court on March 24, 2022. Copy emailed to Mr. Stillman.

16
17
18  Fernando Gastelum

19

20

21

22

23

24

25

26

27

28

1

## EXHIBIT 1

2

3   9/9/21, 1:43 PM                                        Gmail - Notice of Motion and Motion for Rule 11 Sanctions

4   **M Gmail**                                     Fernando Gastelum <fernandog8895@gmail.com>

5

6   **Notice of Motion and Motion for Rule 11 Sanctions**
    1 message

7   Philip H. Stillman <pstillman@stillmanassociates.com>                    Wed, Sep 8, 2021 at 9:40 AM
    To: Fernando Gastelum <fernandog8895@gmail.com>

8

9   As you know, I represent defendant TC HERITAGE INN 2 OF BAKERSFIELD LLC.  Attached hereto is a
    Notice of Motion and Motion for Rule 11 Sanctions.  Pursuant to Fed.R.Civ.P. 11, you are entitled to 21 days'

10  notice before a party can file a Motion for Sanctions, which you are being given today.  If you do not
    withdraw your frivolous and false complaint, my client will file the attached motion, and seek all of its
    attorney's fees incurred in defending this frivolous action.

11

12  Remember this email.  I intend to get your complaint dismissed, require you to post a bond in the unlikely
    event that it is not dismissed with prejudice, and my client will seek all of its attorney's fees from you.  I think

13  that your litigation history from the Arizona federal courts speaks for itself, but my client will also seek to
    have you declared a vexatious litigant, which will require you to obtain prior permission from the presiding
    judge before you file a complaint.  At this time, my client will accept an immediate dismissal with prejudice,

14  and you may go about your business against other defendants.  If not, I will be filing a motion to dismiss
    based on *Gastelum v. Canyon Hospitality, LLC*, which others whom you have sued will be able to access

15  and use to get your complaints dismissed against them with little cost to them, which will further impede
    your new business venture in California.

16

17  I strongly encourage you to take this matter seriously.

18  Philip H. Stillman | STILLMAN • ASSOCIATES
    3015 North Bay Road | Suite B |

19  Miami Beach, FL 33140 |
    V: 888.235.4279 | F: 888.235.4279

20  pstillman@stillmanassociates.com
    www.stillmanassociates.com

21

22

23

24

25

26

27

28

EXHIBIT 4

1   Name: Fernando Gastelum
2   Address: 209 W. 9th Street, Casa Grande, AZ 85122
    Telephone Number: 520-560-0927
3   Email: fernandog8899@gmail.com
4   *Pro se*

5                **UNITED STATES DISTRICT COURT**

6                **NORTHERN DISTRICT OF CALIFORNIA**

7

8                                              Case No.: 5:21-cv-05291-VKD
9   Fernando Gastelum,
                                               **Plaintiff's Supplemental**
10                  Plaintiff,                 **Memorandum in Opposition /**
                                               **Response to Defendant's Motion**
11  vs.                                        **to Dismiss For Lack of Standing**
12
13  Tri-County Hospitality Inc. dba Quality    Date: April 19, 2022
    Inn & Suites Gilroy,                       Time: 10 a.m.
14                                             Courtroom: 2 - 5th Fl
                    Defendant.                 San Jose
15                                             Hon. Virginia K. DeMarchi
16

17      Defendant's latest attempt to extricate itself from its exercise of systemic

18  segregation against the disabled individuals is based on false information and

19  non-disclosure. It is no more than a continuation of on Mr. Stillman's avowed

20  effort to deprive Plaintiff of his constitutional rights one way or another *unless*

21  Plaintiff dismisses his cases with prejudice[1] **(Exhibit 1):**

22
        Remember this email. I intend to get your complaint dismissed,
23      require you to post a bond in the unlikely event that it is not dismissed
        with prejudice, and my client *will* seek all of its attorney's fees from
24      you. ...[M]y client will also seek to have you declared a vexatious
        litigant, which will require you to obtain prior permission from the
25      presiding judge *before* you file a complaint. **At this time, my client**
26      **will accept an immediate dismissal with prejudice and you may**
27
    ─────────────────
    [1] Mr. Stillman issued this extortionate threat in different case but has been
28  applying it to all case. *See* Exhibit 3.

                                    1

1
2      **go about your business against other defendants...** (Emphasis
       supplied)

3          So, if Plaintiff does not dismiss his cases with prejudice, Mr. Stillman will

4      revoke his 1st Amendment right to redress. Such level of coercion by attorneys

5      has been recognized as extortion by the California Court of Appeals. **Exhibit 2.**

6          In his Reply in this case, ECF 26, as is his regular practice, Mr. Stillman

7      offers false and misleading testimony through his retained expert Mr. Layman. In

8      his Declaration, ECF 26.1, Mr. Layman offers the same type of deceit that he and

9      Mr. Stillman offered in the Eastern District cause no 1:21-cv-01230-JLT-BAK at

10     ECF 18, **Exhibit 3**. This appears to be Mr. Stillman's regular practice.

11         The following table shows the deceit practiced by Messrs. Stillman and his
       expert, Mr. Layman:
12

| DEFENDNT'S PHOTOS | ACTUAL PHOTOS |
|---|---|
|  | |

The vertical line represents the center of the washing machine, the horizontal line represents the distance between the center of the washing machine and the support column.

Defendant's photo is deceptive for 2 reasons:

1. 611.2 Clear Floor Space. A clear floor or ground *space* complying with 305 positioned for parallel approach shall be provided. The clear floor or ground *space* **shall be centered on the appliance.** Defendant's photo clearly

shows that the clear floor space is not **centered** on the washing machine. The washing machine is 27" wide, so the center of it had to be 24 inches from the support column. It is not. It is 13.5" away. As an expert, Mr. Layman should know this.

2. Defendant's photo shows a repositioned washing machine. ECF 26-1 at ¶19. This does not "moot" the issue because, as stated in the opinion of the Honorable Thomas S. Hixson, ECF 25-4, a "claim may become moot if (1) subsequent events have made it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation". Defendant admits that the washing machine has been easily repositioned and can be reasonably repositioned again.

1. Mr. Layman admits that "my inspection showed that there were stairs to the second floor of each building at the Hotel that did not have open risers and comply with 2010 ADA Standards § 504.3 (the same as 1991 ADA Standards § 4.9.2) for open risers." But he then argues that "upon request, Mr. Gastelum would have been provided a room nearest the stairs with the closed risers."



However, Mr. Layman declines to disclose that the removal of this barriers is readily achievable:

2. **28 C.F.R. §36.304 Removal of barriers.** *General.* A public accommodation shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removalist readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty or expense.

| | |
|---|---|
| 3. Additionally, there are *no accessible stairs* by virtue of lack of top or bottom handrail extensions. | |
| Mr. Layman agrees that the staircase has no top or bottom handrail extensions but claims that the stairs have not been altered and, consequently, there is no requirement for the extensions.<br><br>Mr. Layman does not disclose that the extension of handrails is readily achievable under 28 C.F.R. §36.304. |  |
| Mr. Layman then states that he "I examined each door on an *accessible* route into the Hotel and found all doors on any accessible route," ECF 26-1 at ¶11.<br><br>Inexplicably, Mr. Layman then attaches 6 photos of doors on accessible routes that require the twisting of the writs. Here is a sample:<br><br><br><br>**309.4 Operation.** *Operable parts* shall be operable with one hand and shall | No photo by allegation that allegation at §9(b) of the amended complaint ECF 20:<br><br>b. Doors require twisting of the wrist. This condition makes it more difficult for [Plaintiff] to enter the doors on accessible routes. |

| | |
|---|---|
| not require tight grasping, pinching, or twisting of the wrist.<br><br>28 C.F.R. §36.304(b)(11) which specifically finds that " Installing accessible door hardware" is readily achievable. | |

## CONCLUSION AND PRAYER FOR RELIEF

Plaintiff desire is to prevent systemic segregation exercised by public accommodations. Plaintiff desires to do so fairly and accurately, without having to review and correct Mr. Stillman's deceptions.

RESPECTFULLY SUBMITTED on March 23, 2022.

Fernando Gastelum

PACER filed on March 23, 2022.

/s/

5



**UNITED STATES POSTAL**



**P**

U.S. POSTAGE
$8.95
PRFL        0004
Orig: 85028
04/20/22
2000232445

PRIORITY MAIL 2-DAY®

1 Lb 6.80 Oz

0004

EXPECTED DELIVERY DAY:  04/23/22

C037

SHIP
TO:   333 W BROADWAY
      STE 420
      SAN DIEGO CA 92101-3806

**IORIT**
**MAIL**

elivery specified*
ACKING™ included to ma
nal destinations.
ternational insurance.
vailable.*
plies online.*
ed internationally, a custom
n label may be required.
c only



USPS TRACKING® #

9505 5270 1871 2110 0807 38



OD: 12 1/2 x 9 1/2          USPS.COM/PICKUP

0001000014

⤬ For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 4 lbs.

FROM:

Peter Strojnik
7847 N Central Avenue
Phoenix, Arizona 85020



RECEIVED
APR 2 2 2022
CLERK, U.
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY

TO:

Clerk of the Court
United States District Court
Southern District of California
333 West Broadway, Suite 420
San Diego, CA 92101

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Priority Mail® shipments.
Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018; All rights reserved.

* Domestic only. * For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.

VISIT US AT USP
ORDER FREE SUPPLIE

EP14F Oct 2018
OD: 12 1/2 x 9 1/2



P S0000100000014

FLAT RATE EN
ONE RATE ✶ ANY WE

PRIORITY
MAIL



TRACKE
✶ ✶ ✶
INSURE



UNITED STATES
POSTAL SERVICE®